**A. G. ATTEBURY et ux., et al.,
Plaintiffs-Appellees,**

v.

**UNITED STATES of America,
Defendant-Appellant.**

**No. 27915.**

United States Court of Appeals,
Fifth Circuit.

July 30, 1970.

Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Div. U. S. Dept. of Justice, Washington, D. C., Gene A. Castleberry, Atty, Tax Div., Dept. of Justice, Fort Worth, Tex., Jonathan S. Cohen, Stuart A. Smith, Harry Baum, Attys., U. S. Dept. of Justice, Washington, D. C., for appellant.

Ben Bird, Fort Worth, Tex., for appellees.

Before RIVES, GEWIN and INGRAHAM, Circuit Judges.

RIVES, Circuit Judge:

Appellee taxpayers brought this action in the district court for refund of federal income taxes for the year 1959 in the total amount of $120,345.51 plus statutory interest. The district court awarded judgment to the taxpayers. The sole issue on appeal is the proper tax treatment of certain cash distributions by Attebury Elevators, Inc. (Elevators) to its three shareholders [1] (taxpayers) during the calendar year 1959, but more than three and one-half months after the corporation's fiscal year ended on May 31, 1959.

## I.

Neither party objects to the district court's findings of fact, which we summarize as follows. Elevators was incorporated under the laws of Texas on June 1, 1958, with its fiscal year ending May 31 for federal income tax purposes. Effective for fiscal year ending May 31, 1959, Elevators and its three shareholders properly elected to have the corporation treated as a Small Business Corporation pursuant to provisions of Subchapter S (sections 1371–77) of the 1954 Code.

For the fiscal year ending May 31, 1959, Elevators reported a taxable income of $271,431.22, which the Commissioner changed after audit to $266,960.27. This amount was reported in proportionate shares by taxpayers in their 1959 calendar year returns pursuant to section 1373(a) and (b).[2]

[1] A. G. Attebury owned 60% of the stock in Elevators, while each son, Sam L. and William H., owned 20%. All three were calendar year taxpayers.

[2] The provisions of Subchapter S of the 1954 Code permit an electing corporation to avoid tax at the corporate level, and require the individual shareholders to pay tax on corporate earnings whether or not distributed to the shareholders (somewhat similar to the taxation of members of a partnership). If there are no cash distributions to the shareholders during the corporation's taxable year (or within 2½ or 3½ months thereafter as provided in section 1375(f)), the taxable income of the corporation, as defined by section 1373(d), is labelled "undistributed taxable income" (with certain adjustments not

Taxpayers, as sole shareholders and directors, agreed during Elevators' 1959 fiscal year that the corporation would distribute its entire taxable income for the fiscal year ending May 31, 1959, to the taxpayers before or on May 31, 1959, with these payments being treated as dividends.[3] However, during the 1959 fiscal year, taxpayers did not need the funds and no distributions were made. Taxpayers agreed that any one of them could withdraw his share of corporate taxable income as he needed it. Although prior to the end of the corporation's fiscal year the exact corporate taxable income was unknown, taxpayers could ascertain such income with reasonable accuracy through financial statements. The district court concluded: "During May, 1959, there were no substantial limitations or restrictions on the right of any shareholder to withdraw his share of such net income."

Beginning in July 1959, taxpayers received distributions from the corporation in the following amounts:

| "Paid to: | Date: | Amount |
|---|---|---|
| "W. H. Attebury | 7/ 2/59 | $ 6,000.00 |
| W. H. Attebury | 7/ 9/59 | 6,000.00 |
| A. G. Attebury | 7/13/59 | 7,500.00 |
| S. L. Attebury | 7/13/59 | 7,500.00 |
| W. H. Attebury | 7/13/59 | 7,500.00 |
| A. G. Attebury | 7/31/59 | 73,882.63 |
| S. L. Attebury | 7/31/59 | 19,627.54 |
| W. H. Attebury | 7/31/59 | 15,127.54 |
| W. H. Attebury | 9/16/59 | 19,627.54 |
| A. G. Attebury | 10/ 1/59 | 81,382.62 |
| S. L. Attebury | 10/ 1/59 | 27,127.54" |

Taxpayers did not include these distributions in their 1959 calendar year returns,

apparently on the theory that the distributions constituted Elevators' taxable income for its 1959 fiscal year, which amount was already included in taxpayers' 1959 calendar year returns pursuant to section 1373(a) and (b).

The same procedure was followed during Elevators' 1960 fiscal year which ended on May 31, 1960. For this year, Elevators reported taxable income of $258,610.57, which was changed on audit to $242,100.04. This amount was reported in proportionate shares by taxpayers on their calendar year returns for 1960. See note 2 *supra*. Again, taxpayers received distributions from Elevators in the following amounts as constituting corporate taxable income for its June-May 1960 fiscal year:

| "Paid to: | Date: | Amount |
|---|---|---|
| "A. G. Attebury | 4/15/60 | $60,000.00 |
| W. H. Attebury | 4/15/60 | 20,000.00 |
| S. L. Attebury | 4/15/60 | 20,000.00 |
| A. G. Attebury | 7/ 1/60 | 54,000.00 |
| W. H. Attebury | 7/ 1/60 | 18,000.00 |
| S. L. Attebury | 7/ 1/60 | 18,000.00 |
| S. L. Attebury | 8/ 1/60 | 13,722.12 |
| W. H. Attebury | 8/ 1/60 | 13,722.11 |
| A. G. Attebury | 9/23/60 | 41,166.24" |

Upon audit, the Commissioner determined that taxpayers should have included in their 1959 calendar year returns not only their distributive shares of the taxable income of the corporation for its fiscal year ending May 31, 1959,[4] but also the above-stated distributions paid to them during the calendar year 1959 (distributions from July 2 through October 1). The government's theory was that

pertinent here). Section 1373(c). The amount of cash distributions, to the extent they are distributions out of earnings and profits of the taxable year, see section 1373(c), reduce "undistributed taxable income" and, of course, are taxable to the shareholder ¬s dividends. The "undistributed taxable income" (or the taxable income of the corporation minus such cash distributions) is included in the gross income of each shareholder. Section 1373 (a) and (b).

According to taxpayers' returns for calendar year 1959, the taxable income of Elevators for its taxable year ending May 31, 1959 ($266,960.27) was included in taxpayers' gross income as "undistributed

taxable income" pursuant to section 1373(a) and (b).

3. Although there was no formal declaration of dividends by the taxpayers as directors of Elevators, the district court concluded that "[s]uch agreements and understandings among all of the directors and shareholders constituted the declaration of dividends. * * *"

4. The Commissioner, as well as taxpayers on their individual 1959 calendar year returns, treated the entire taxable income of Elevators ($266,960.27) for its fiscal year ending May 31, 1959, as undistributed taxable income and thus includable in taxpayers' gross income for 1959 under section 1373(a) and (b).

the distributions after the close of the corporation's fiscal year ending May 31, 1959, were dividend distributions to the extent of Elevators' earnings and profits *for the fiscal year ending May 31, 1960.* Because these distributions were made in 1959, they were includable, to the extent stated above, in taxpayers' 1959 calendar year returns.

The Commissioner also determined that taxpayers had overstated their income for the calendar year 1960, and after deducting the overassessments from the deficiencies, sent taxpayers a deficiency notice. Taxpayers paid the amount due plus interest and commenced this action.

Subsequently, on December 19, 1968, Elevators filed with the Commissioner an election pursuant to the provisions of section 1375(f) and Treasury Regulation § 1.1375–6(b).[5] Under the election, distributions made by Elevators for three and one-half months (September 15) after the close of its fiscal years ending May 31, 1959 and May 31, 1960, are considered to have been made as of the close of that fiscal year.[6] On the basis of this election, the district court held that taxpayers were at least entitled to partial refunds. On appeal, the government does not contest this holding.

The district court also held that taxpayers were entitled to a *total* refund on alternative theories: (1) that taxpayers were in "constructive receipt" of all of Elevators' undistributed taxable income (as defined in section 1373(c)) as if such income had been distributed to taxpayers on the last day of Elevators' fiscal years

ending May 31, 1959 and May 31, 1960; and (2) that the cash distributions in question were payments by Elevators to taxpayers on corporate debts created prior to the end of Elevators' fiscal year by the declaration of a dividend equal to the amount of the corporation's taxable income. The government contends on appeal that the district court erred in both holdings.

## II.

Because the government does not object to the district court's holding that taxpayers' election under section 1375(f) was a valid one, the distributions whose proper tax treatment remains disputed on appeal are:

| "Paid to: | Date: | Amount |
|---|---|---|
| "W. H. Attebury | 9/16/59 | [$]19,627.54 |
| A. G. Attebury | 10/ 1/59 | 81,382.62 |
| S. L. Attebury | 10/ 1/59 | 27,127.54" |

The government contends that these payments are taxable as dividends (to be reported on taxpayers' 1959 calendar year returns) to the extent of Elevators' earnings and profits for its fiscal year ending May 31, 1960. Since the corporation did have earnings and profits for its taxable year ending May 31, 1960, the distributions in question are includable in taxpayers' gross income on their 1959 calendar year returns.[7] Taxpayers, however, argue that they "constructively received" these distributions on or before May 31, 1959, and thus that the payments were only distributions of sums constructively received during Elevators' taxable year ending May 31, 1959.

5. Congress added section 1375(f) to the Subchapter S provisions by the Act of April 14, 1966, P.L. 89–389, 80 Stat. 111. Section 1375(f) permits distributions made within two and one-half months, and in some circumstances distributions before 1966 within three and one-half months, after the close of a Subchapter S corporation's taxable year to be treated as if they had been made as of the close of the taxable year.

6. Pursuant to this election, the distributions listed above which were made between June 1 and September 15 for both

1959 and 1960 are considered as distributions as of the close of Elevators' fiscal years ending May 31, 1959 and 1960.

7. See note 28 *infra.* If distributions of money during a corporation's taxable year (here, June 1, 1959 to May 31, 1960) exceed the earnings and profits of such year, Treasury Regulation § 1.1373–1(d) (1959) provides that the "proportion of each such distribution which the total of the earnings and profits of the year bears to the total of such distributions made during the year shall be regarded as out of the earnings and profits of that year."

Under the government's argument, the following tax consequences develop. Since there were no cash distributions by Elevators during its taxable year ending May 31, 1959 (except for distributions considered to have been made as of May 31, 1959, under the section 1375(f) election), the corporation's taxable income is included in taxpayers' gross income for calendar year 1959 as "undistributed taxable income" pursuant to section 1373 (a) and (b). See note 2, *supra*. The cash distributions in question, regardless of taxpayers' intention that they were only to be distributions of the corporation's previous year's taxable income, must also be included in taxpayers' gross income for calendar year 1959 as dividends, to the extent of the corporation's earnings and profits for its taxable year ending May 31, 1960. The Subchapter S statute, its legislative history, and the regulations promulgated thereunder, the government argues, demand this result.

Under taxpayers' "constructive receipt" argument, the corporation's entire taxable income for the year ending May 31, 1959, was distributed on or before May 31, 1959. Thus, the corporation's "undistributed taxable income" is zero, and taxpayers must include the distributions, constructively received as of May 31, 1959, in gross income as dividends.[8]

Crucial to both arguments is whether or not the distributions in question, in terms of section 1373(c),[9] were amounts of money distributed to taxpayers during the corporation's taxable year ending

May 31, 1959. Taxpayers contend that "amounts of money distributed during the taxable year" can be construed, pursuant to the constructive receipt doctrine,[10] to include distributions constructively received by shareholders during the corporation's taxable year. We agree with the government, however, that the constructive receipt doctrine is inapplicable in determining the "amount of money distributed during [a corporation's] taxable year." Our conclusion is premised upon the Subchapter S statute, its legislative history, and the regulations promulgated thereunder.

### a. *Statutory Scheme and Regulations*

Subchapter S (sections 1371–78) permits shareholders of certain closely-held corporations to eliminate taxation at the corporate level on the condition that each shareholder includes in his own gross income his share of the corporation's income whether or not distributed to him during the corporation's taxable year. *See* section 1373(a) and (b); note 2 *supra*. The amount of corporate taxable income which is not distributed during the corporate year is designated (and is included in the shareholder's gross income) as "undistributed taxable income."[11]

In order to avoid the possibility that undistributed taxable income, which has already been included in the shareholders' gross income in one year, will not be taxed again in a subsequent year when this amount is actually distributed, sec-

---

8. See note 2 *supra*. It is interesting to note that, contrary to its "constructive receipt" argument, taxpayers in filing their 1959 calendar year returns treated Elevators' entire taxable income for the year ending May 31, 1959, as "undistributed taxable income," and not as dividends constructively received as of May 31, 1959.

9. "(c) *Undistributed taxable income defined.*—For purposes of this section, the term 'undistributed taxable income' means taxable income (computed as provided in subsection (d)) minus the sum of (1) the tax imposed by section 1378(a) and (2) the amount of money distributed as divi-

dends during the taxable year, to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316 (a) (2)."
26 U.S.C.A. § 1373(c).

10. See note 18 *infra*.

11. Undistributed taxable income, for purposes of this case, is defined in section 1373(c) as the corporation's taxable income minus the amount of money distributed as dividends during the taxable year to the extent that such amount is a distribution of earnings and profits of the taxable year as defined in section 316(a) (2).

tion 1375(d)[12] provides that the corporation may distribute previously taxed undistributed taxable income without dividend consequences. This section, however, must be read in conjunction with Treasury Regulation § 1.1375–4(b), which states that "a distribution of previously taxed income *may occur only* if during its taxable year the corporation makes such money distributions in excess of its earnings and profits for such taxable year." (Emphasis added.) Thus, the tax-free receipt of previously taxed "undistributed taxable income" can occur only in a year in which the total cash distributions[13] exceed that year's earnings and profits.

The peculiar problem arising in this case results when a Subchapter S corporation's taxable year ends (May 31, 1959) several months before its shareholders' taxable year ends (December 31, 1959), and the shareholders receive cash distributions in the interval (September 16 and October 1, 1959). The preceding paragraph illustrates that shareholders of Subchapter S corporations could avoid unfavorable tax consequences (often referred to as "locked-in earnings") by distributing the corporate taxable income currently. However, because of a cor-

poration's lack of cash or the inability on or before the last day of the taxable year to determine accurately corporate taxable income, current distribution of taxable income is not always feasible.[14] Section 1375(f), enacted in 1966, offers a limited solution to this problem—cash distributions made within two and one-half months (or within three and one-half months in years prior to 1966) after the close of the corporate taxable year are treated as if they were made on the last day of that taxable year.[15]

It is clear, however, that cash distributions made after the elective three and one-half month period, but before the end of the shareholders' taxable year, must be included, with one exception, in the shareholders' gross income for that year as dividends. Under the statutory scheme and regulations thereto,[16] these distributions are regarded as having been made out of the earnings and profits of the following corporate taxable year (here, May 31, 1960), and (the one exception, section 1375(d)) are tax-free to the shareholders *only* to the extent that total cash distributions for that fiscal year exceed earnings and profits for such year.[17]

12. "(d) (1) *Distributions not considered as dividends.*—An electing small business corporation may distribute, in accordance with regulations prescribed by the Secretary or his delegate, to any shareholder all or any portion of the shareholder's net share of the corporation's undistributed taxable income for taxable years prior to the taxable year in which such distribution is made. Any such distribution shall, for purposes of this chapter, be considered a distribution which is not a dividend, but the earnings and profits of the corporation shall not be reduced by reason of any such distribution." 26 U.S. C.A. § 1375(d) (1).

13. Treasury Regulation § 1.1375–4(b) (1959) specifies that the distributions must be cash and not property. *See* Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 731–34 (2d ed. 1966).

14. See S.Rep.No.1007, 89th Cong., 2d sess., 2 U.S.Code Cong. & Ad.News, pp. 2141, 2143 (1966) (legislative history of section

1375(f)); 7 Mertens, Law of Federal Income Taxation § 41B.32, at p. 61 (1967).

15. *See generally* Levi, The subchapter S Election; Friend or Foe? 32 Mo.L.Rev. 185, 190–91, 197–98 (1967); Schwartz, New Subchapter S Law Passed, 24 J. Taxation 370 (1966).

16. Section 1375(d); Treasury Regulations §§ 1.1373–1(d) & (e), 1.1375–4(b) (1959).

17. *See* Benderoff v. United States, 270 F. Supp. 87 (S.D.Ia.1967), rev'd on other grounds, 398 F.2d 132 (8 Cir. 1968), Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 731–34 (2d ed. 1966). *See also* 7 Mertens, Law of Federal Income Taxation §§ 41B.32, .34 (1967); White, Recurring and New Problems Under Subchapter S, N.Y.U. 27th Inst. on Fed.Tax. 755, 790 (1969); Wood, How to Avoid the Unexpected Tax Problems Under Subchapter S, 21 J.Taxation 168, 170 (1964); Note, "Locked-in Earnings"—

The above statutory scheme and regulations dictate that the cash distributions in question must be included in taxpayers' 1959 gross income as dividends. However, taxpayers attempt to avoid this result through application of the constructive receipt doctrine.

██ Section 1373(c) defines "undistributed taxable income" as "taxable income * * * minus the *amount of money distributed* as dividends *during the taxable year* * * *"" (Emphasis added.) Taxpayers argue that "when sections 1373(b) and (c) define the corporate income to be taxed to the shareholders as being the amounts distributed to shareholders during the year, plus the undistributed taxable income for the year, the constructive receipt doctrine [18] steps in and defines the amounts which were distributed during the year."

We cannot agree with taxpayers' argument. In our opinion, the phrase "amount of money distributed * * * during the taxable year" means actual cash distributions to shareholders before the end of the corporate year.

The regulations to section 1373 elaborate upon the meaning of this phrase. Regulation § 1.1373–1(f) provides:

"(f) *When distributions are considered made.* Except as otherwise provided in § 1.1375–5, an actual distribution by an electing small business corporation will be considered to be made only at the time it is received by the shareholder, and earnings and profits of such corporation shall not be reduced with respect to such distribution before such time."

Taxpayers contend that the wording of the regulation—"received by the shareholder"—means actual receipt of cash *or* cash unqualifiedly available to stockholders (thus constructively received by stockholders as per the constructive receipt doctrine). Taxpayers seem to overlook the phrase "actual distribution" in the above-quoted regulation. After viewing the entire regulation, we find no merit in taxpayers' attempt to assimilate the word "received" to the definition of that word in section 451(a), as contained in the constructive receipt rule of Regulation § 1.451–2(a), quoted in note 18 *supra*. The import of Regulation § 1.1373–1(f), when read in context with section 1373(c), the regulations,[19] and the legislative history discussed below, is that a distribution is deemed to occur only when it is actually paid by the corporation.[20]

---

How Serious a Problem Under Subchapter S?, 49 Va.L.Rev. 1516, 1521 (1963).

18. The constructive receipt doctrine, which has been recognized by this Court, *e. g.,* United States v. Hancock Bank, 400 F.2d 975 (5 Cir. 1968) ; Sowell v. Commissioner of Internal Revenue, 302 F.2d 177 (5 Cir. 1962) ; A. D. Saenger, Inc. v. Commissioner of Internal Revenue, 84 F. 2d 23 (5 Cir. 1936), is set forth in Treasury Regulation § 1.451–2(a) (1964) :
"(a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *"

19. Treasury Regulation § 1.1373–1(d) (1959) ("earnings and profits of the taxable year are first allocated to *actual distributions of money* made during such taxable year * * *") ; Treasury Regulation § 1.1373–1(e) (1) (1959) ("earnings and profits of the taxable year are first allocated to *the actual distributions* of money * * *"). (Emphasis added.)

20. *See* S.Rep.No.1983, 85th Cong., 2d sess., p. 219, 3 U.S.Code Cong. & Ad.News, pp. 4791, 5007 (1958) ; 7 Mertens, Law of Federal Income Taxation §§ 41B.25, .26 (at p. 45), .27 (at pp. 46–47), .28 (at p. 49) (1967) ; Braverman, Special Subchapter S. Situations—Regulations Run Rampant, 114 U.Pa.L.Rev. 680, 689, 693 n. 71 (1966) ; Lourie, Subchapter S After Six Years of Operation, 22 J.Taxation 166, 167 (1965) ; Partnerships and Sub-

Taxpayers also attempt to buttress their position by focusing on the last sentence of section 1373(b).[21] They apparently urge that this sentence establishes a statutory presumption that all earnings of a Subchapter S corporation are deemed to have been distributed as of the close of the corporation's taxable year. This contention is completely without merit. The sole purpose of section 1373(b) is to define the amount of undistributed taxable income which a shareholder must include in his own gross income. The last sentence of section 1373(b) merely characterizes such income "as an amount distributed as a dividend" in order to illustrate more clearly the ordinary income tax consequences of undistributed taxable income. That such a distribution is a hypothetical one is clearly demonstrated by the first sentence of section 1373(b)—"the amount he *would have received* as a dividend, if on such last day there *had been distributed* * * * an amount equal to the corporation's undistributed taxable income. * * * *"[22] (Emphasis added.)

### b. *Legislative History*

■ In addition to the above statutory scheme and regulations, the relief provisions of section 1375(f), enacted in Act of April 14, 1966, P.L. 89–389, 80 Stat. 111, demonstrate that the distributions in question are includable in taxpayers' 1959 gross income as dividends.[23]

It is clear that Congress enacted section 1375(f) to alleviate a problem confronting not only taxpayers but also many Subchapter S corporations. This problem arises when the corporation cannot make an actual cash distribution of its taxable income before the close of its taxable year, but distributes the taxable income to its shareholders shortly after the end of the taxable year. This problem is especially acute when the corporation's taxable year does not coincide with its shareholders' taxable year (as illustrated in this case). In this situation there is a bunching of income during the shareholders' taxable year, as illustrated in the legislative history of section 1375(f).

"One type of situation where hardship may exist in the case of such a distribution made shortly after the end of a year arises where the shareholder is on a taxable year ending 1 month or more after that of the corporation. This can be illustrated by a corporation with the taxable year ending on November 30 and a shareholder with a

---

chapter S: A Comparison of Tax Advantages, N.Y.U. 25th Inst. on Fed. Tax. 151, 198 (1967).

21. "(b) *Amount included in gross income.*—Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. *For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation.*" 26 U.S.C. § 1373(b) [Emphasis added.]

22. *See also* Treasury Regulation § 1.1373–1(e) (1959); Bittker & Eustice, *supra*

note 17, at 722–26; 7 Mertens, *supra* note 20, at § 41B.26. In addition, if taxpayers' construction of section 1373(b) were correct, there would clearly be no need for the basis adjustment provisions of section 1376(a).

23. Taxpayers, relying on Penn Mutual Life Ins. Co. v. Lederer, 252 U.S. 523, 537–538, 40 S.Ct. 397, 64 L.Ed. 698 (1920), contend that subsequent legislation is not relevant in construing prior legislation. Therefore, they argue, neither section 1375(f) nor its legislative history is applicable in determining the proper tax treatment of the distributions in question. In this case, however, we examine section 1375(f) and its legislative history not for purposes of construing words whose meaning is doubtful but to illustrate the problem which existed before section 1375(f) was enacted and the manner in which Congress attempted to solve the problem.

taxable year ending on December 31. In such a case, if the corporation has made no distribution by November 30, each shareholder is taxed on his proportionate share of the taxable income of the corporation for that year. If the corporation then distributes this income to the shareholders during December, the shareholder will be faced with a double inclusion of the corporation's earnings in 1 year since such a shareholder first is taxed on his share of the undistributed earnings as of November 30; then, when the actual distribution is made in the following December, it is treated as a distribution out of the earnings and profits of the corporation for that following year. Thus, this distribution, too, is taxable to the shareholder."

S.Rep. No. 1007, 89th Cong., 2d sess., p. 4, 2 U.S.Code Cong. & Ad.News, pp. 2141, 2143–2144 (1966); see discussion in Part IIa, *supra.*

In discussing the need for relief legislation, the Senate Committee specifically recognized that under the then-existing law a shareholder is taxable on cash dividends actually received, to the extent of current earnings and profits during the corporate taxable year, *and* on all undistributed taxable income for that taxable year.

"The present small business corporation provision treats *distributions of money* made during the corporation's year as being made first out of the corporation's earnings and profits of that year. If the corporation's income for the year exceeds *these actual distributions made during the year,* then this remaining income is treated as if it were distributed to the shareholders on the last day of the corporation's year and taxed to the shareholders as if received by them at that time." (Emphasis added.)

S.Rep. No. 1007, 89th Cong., 2d sess., p. 3, 2 U.S.Code Cong. & Ad.News, pp. 2141, 2143 (1966).

Section 1375(f) solves the bunching-of-income problem for cash distributions made within two and one-half months, and in some circumstances distributions before 1966 within three and one-half months, after the close of the corporation's taxable year. These distributions, as illustrated by an example in the Senate Finance Committee's Report, are treated as if they were made as of the last day of the previous corporate taxable year.

"*Example* (1).—X corporation, an electing small business corporation which uses the fiscal year ending March 31 as its taxable year, has two shareholders, A and B, calendar year taxpayers each owning 50 percent of its outstanding stock. For its year ending March 31, 1967, X has made no distributions to its shareholders and has undistributed taxable income (as defined in sec. 1373(c)) of $50,000. On May 1, 1967, X distributes $25,000 in money to A and $25,000 in money to B. X makes no further distributions to A and B during the calendar year 1967, even though it has earnings and profits of $60,000 for its taxable year ending on March 31, 1968.

"Under existing law, A and B would each include $50,000 in gross income for the calendar year 1967; $25,000 of this would be includible under Section 1373(b) and the other $25,000 would be includible by reason of the May 1, 1967, distribution. Pursuant to new section 1375(f), however, the May 1, 1967 distribution is treated as a distribution of X's undistributed taxable income for its year ending March 31, 1967, and will not increase A's and B's gross incomes."

*Id.* at 2152–2153.

The legislative history of section 1375 (f) clearly demonstrates that the relief provision was intended to solve the bunching-of-income problem, resulting from a Subchapter S corporation's inability to make actual cash distributions of its taxable income before the end of

its taxable year.[24] From the above legislative history, it is clear to us that Congress interpreted the Subchapter S provisions as requiring the following: Unless such actual cash distributions were made before the close of the corporation's tax year (thus reducing the amount of undistributed taxable income for that year to the extent such distributions were dividends), they were includable in the shareholders' gross income when ultimately distributed in the subsequent tax year of the corporation to the extent of that year's earnings and profits. This analysis forecloses use of the constructive receipt doctrine in the manner proposed by taxpayers and implemented by the district court.[25]

Taxpayers' reliance upon a statement in the original legislative history of Subchapter S [26] is completely without merit. The quoted excerpt properly describes the statutory mechanism (section 1375(d)) designed to prevent a second round of dividend income upon a distribution of previously taxed undistributed taxable income. However, taxpayers overlook the fact that section 1375(d)(1), "in accordance with regulations prescribed by the Secretary or his delegate [Regulation § 1.1375–4]," establishes a system of priorities whereby a cash distribution is always deemed to be made first out of *current* earnings and profits. Treasury Regulation § 1.1375–4(d) (1959). Once current earnings and profits of a given corporate year are distributed, the next distributions are deemed to be made out of previously taxed undistributed taxable income See note 7 supra.

### III.

The district court also held that taxpayers were entitled to a total refund in that the distributions made after the close of Elevators' fiscal years (May 31, 1959 and May 31, 1960) were payments by Elevators to taxpayers on corporate debts created prior to the end of the tax year by the declaration of a dividend equal to the amount of the corporation's taxable income. Both taxpayers and the district court cite Roe v. Commissioner of Internal Revenue, 192 F.2d 398 (5 Cir. 1951) and Commissioner of Internal Revenue v. Cohen, 121 F.2d 348 (5 Cir. 1941), to support this theory of recovery. We find these cases to be inapplicable and, therefore, conclude that the above holding by the district court is erroneous.

24. As pointed out above, taxpayers filed an election in 1968, pursuant to section 1375 (f) and Treasury Regulation § 1.1375–6(b), in order to receive tax relief for all distributions received within three and one-half months after Elevators' taxable years ending May 31, 1959 and 1960 (that is, distributions between June 1 and September 15).

25. Even assuming *arguendo* that the constructive receipt doctrine is applicable for purposes of determining "the amount of money distributed" within the meaning of section 1373(c), we conclude that taxpayers cannot benefit from its application. The facts in this case do not support the inference that the corporate earnings were "unqualifiedly * * * subject to the demand of the shareholder[s]," the very essence of the constructive receipt doctrine. See Treasury Regulation § 1.451–2(b) (1957). It is clear from the record, and the district court specifically found, that Elevators' taxable income was unknown on the last day of the corporation's taxable year. In the light of these findings, it is clear that the alleged dividend distribution was neither credited to the shareholders nor unqualifiedly subject to their demand as of the last day of the corporate taxable year.

26. "Where a shareholder has been taxed on corporate earnings which were not at that time distributed, and then the corporation in a subsequent year distributes these earnings to such shareholders no further tax is required from the shareholder at that time, since these earnings have already been taxed to him in a prior year. Once all such earnings have been distributed, if further distributions are then made, and the corporation had earnings and profits before it elected this special tax treatment, then such distributions are to be taxed to the shareholders in the same manner as ordinary dividends from corporations." S.Rep.No.1983, 85th Cong., 2d sess., p. 88, 3 U.S.Code Cong., & Ad. News, pp. 4791, 4876–4877 (1958).

Implicit in our decision in Roe, as well as the district court's holding in this case, is the inclusion in the shareholder's gross income, when the dividend is declared, of an amount equal to the declared dividends, pursuant to the constructive receipt doctrine. 192 F.2d at 402–403. Since we have concluded that the constructive receipt doctrine is inapplicable, see Part II *supra,* the *Roe* decision is clearly distinguishable. As to the *Cohen* decision, its continued validity is doubtful in light of the later Supreme Court decision in Estate of Putnam v. Commissioner, 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023 (1945).[27]

## IV.

For the above reasons, the district court's holding that taxpayers are entitled to a *total* refund is erroneous. The distributions in question (September 16 and October 1, 1959) are includable in taxpayers' 1959 gross income as dividends to the extent of Elevators' earnings and profits for its taxable year ending May 31, 1960. However, pursuant to taxpayers' election under section 1375(f), the July 2–July 31, 1959 distributions are not includable as dividends in taxpayers' 1951 gross income. Thus, taxpayers are entitled to a partial refund.

Because the distributions in question (September 16 and October 1, 1959) are regarded as distributions out of Elevators' earnings and profits for the year ending May 31, 1960, appropriate adjustments must be made on remand in order to determine the tax consequences of the section 1375(f) election and of subsequent distributions to taxpayers during 1960.[28] Upon consideration of these appropriate adjustments, on remand the district court is to determine the correct amounts of the 1959 deficiencies and 1960 overassessments and to enter judgment for taxpayers in an amount equal to the difference in the

27. In *Cohen* we held that, pursuant to section 42 of the Revenue Act of 1934 [as amended, section 691 of the 1954 Code, 26 U.S.C.A. § 691], a dividend on stock held by the decedent, which was declared prior to the date of his death but was payable to stockholders of record on a date subsequent to his death, should be accrued as part of decedent's gross income. In *Estate of Putnam* the Court held that dividends which were declared prior to decedent's death but were payable to stockholders of record on a date subsequent to his death were not includable in his gross income [under the 1938 version of section 42].

28. The district court having concluded that taxpayers properly elected section 1375(f) treatment for distributions made within three and one-half months after its taxable years ending May 31, 1959 and 1960, the following distributions are deemed to have been made during Elevators' taxable year ending May 31, 1960:

| Paid to: | Date: | Amount: |
|---|---|---|
| W. H. Attebury | 9/16/59 | $19,627.54 |
| A. G. Attebury | 10/ 1/59 | 81,382.62 |
| S. L. Attebury | 10/ 1/59 | 27,127.54 |
| A. G. Attebury | 4/15/60 | 60,000.00 |
| W. H. Attebury | 4/15/60 | 20,000.00 |
| S. L. Attebury | 4/15/60 | 20,000.00 |
| A. G. Attebury | 5/17/60 | 93.47 |
| S. L. Attebury | 5/17/60 | 31.17 |
| W. H. Attebury | 5/17/60 | 31.17 |
| A. G. Attebury | 7/ 1/60 | 54,000.00 |
| W. H. Attebury | 7/ 1/60 | 18,000.00 |
| S. L. Attebury | 7/ 1/60 | 18,000.00 |
| S. L. Attebury | 8/ 1/60 | 13,722.12 |
| W. H. Attebury | 8/ 1/60 | 13,722.11 |

Since these distributions ($345,737.74) exceed the earnings and profits for the above corporate year ($242,100.04), a part of each distribution is deemed to be out of the earnings and profits of the year, with the remainder treated as a tax-free return of previously taxed undistributed taxable income under section 1375(d). See Treasury Regulation § 1.1373–1(d) (1959), quoted in note 7 *supra.* Pursuant to these calculations, only a portion of the distributions in question (September 16, 1959 and October 1, 1959) is includable in taxpayers' 1959 gross income.

In the same manner, only a portion of the distributions made between April 15, 1960, and including, August 1, 1960, is includable in taxpayers' 1960 gross income ($242,100.04 x each distribution).

($345,737.74

The remaining portion is deemed a tax-free return of previously taxed undistributed taxable income.

amounts paid by taxpayers and the re-computed net deficiencies, see note 28 *supra,* plus statutory interest.

Reversed and remanded.