FRED G. BONNER and MARIE M. BONNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bonner v. Commissioner
Docket No. 3763-77.
United States Tax Court
T.C. Memo 1979-435; 1979 Tax Ct. Memo LEXIS 91; 39 T.C.M. (CCH) 403; T.C.M. (RIA) 79435; October 24, 1979, Filed Thomas D. Roberts, for the petitioners. David Roth, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1973
$18,793.00
1974
60,926.00
Because of concessions, the issues remaining for our decision involve only 1974 and are (1) whether petitioner Fred G. Bonner's receipt of $250,000 from his wholly owned subchapter *95 S corporation immediately prior to its sale resulted in dividend income to the extent of the corporation's earnings and profits for the taxable year of distribution, and (2) whether a life insurance policy with a cash surrender value constitutes "money" or "property other than money" for purposes of section 1.1375-4, Income Tax Regs.
FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time they filed their petition in this case, petitioners Fred G. Bonner and Marie M. Bonner, husband and wife, resided in Long Beach, Calif.
Fred G. Bonner (hereinafter petitioner) has been involved in the trucking business all his life. At the time of trial he was the operations manager of and a stockholder in Mock Petroleum Company, a common carrier engaged primarily in hauling petroleum products. From 1962 until May 31, 1974, petitioner was the sole shareholder of Pomona Tank Line, Inc. (hereinafter Pomona), a California corporation hauling gasoline and other fuels and in some instances acting as a broker for the products carried. Pomona and its shareholders had validly elected to be taxed as a small business corporation under the provisions of subchapter *96 S of the Internal Revenue Code [1] since 1958, at which time petitioner was not the sole shareholder. During all relevant years, Pomona used the accrual basis of accounting and filed its returns (Forms 1120S) on a calendar taxable year. Petitioner's acquisition costs for his Pomona stock totaled $78,811.68. As of December 31, 1973, petitioner's net share of Pomona's previously taxed income, as defined in section 1375(d), was $369,906.87, and Pomona's accumulated earnings and profits were $7,925. Petitionerhs average combined salary and undistributed taxable income in the years preceding 1974 was about $60,000 per year, of which roughly $24,000 to $29,000 per year was received by him as salary. Sometime in late 1973 petitioner was approached by Larry T. Smith and Don R. Logan (hereinafter sometimes collectively referred to as the Buyers), who were interested inpurchasing Pomona. After negotiations, petitioner and the Buyers entered into an agreement on May 3, 1974, under which the Buyers assumed immediate management and operation *97 of Pomona with closing to follow shortly. Briefly, the agreement provided Pomona's subchapter S election would stay in effect through the end of 1974; petitioner would receive from Pomona prior to closing distributions of cash, already earned accounts receivable, a car, and a life insurance policy; petitioner would be responsible for any additional taxes due with respect to operations prior to closing; and at closing the Buyers would purchase all of petitioner's stock for cash and an installment note. Petitioner was also to retain a security interest in the transferred stock and to receive payments under a covenant not to compete. Petitioner was assured by his accountant the pretransfer distributions out of Pomona would be tax free because they would be distributions of income already taxed to petitioner under the provisions of subchapter S. In addition, the Buyers had no interest in purchasing cash not needed for operations. For these reasons the agreement explicitly provided the distributions prior to sale were not to be treated as part of the sale price but were to be distributions by Pomona to petitioner with respect to his stock. No private letter ruling as to the character *98 of these transactions was ever requested or received from respondent. The agreement was drafted by the Buyers or their counsel. In the "RECITALS" section the agreement provided in part: The parties intend that, prior to consummation of the sale and purchase of stock provided for herein, Pomona will distribute cash and other property to Seller, [i.e., petitioner] in the amounts and of the nature hereinafter described; that all such distributions shall be taxed directly to Seller, as distributions to a shareholder by a Subchapter S corporation, pursuant to the Subchapter S of the Code and applicable Treasury regulations issued thereunder, or under such other statutes and regulations as may be applicable under the circumstances to distributions by a corporation to a shareholder with respect to his stock; and that no portion of such distributions are or shall be treated as a part of the consideration received by Seller for his stock in Pomona. [Emphasis added.] These intentions were implemented in "Section 5. Preliminary Distributions By Pomona" which provided in part: (i) All of Pomona's cash on hand as of the close of business on March 31, 1974, reduced *99 by the sum of [decrease in freight receivables plus unpaid outstanding liabilities] * * *. (ii) The insurance policy on the life of Seller * * *. As a matter of information only, such policy had a cash surrender value on March 31, 1974 of $6,769.22.
(iii) The Cadillac automobile, * * *. (iv) All rights to collect, receive and retain all brokerage receivables, but only to the extent such receivables were in fact earned and accrued prior to April 30, 1974. Seller, Pomona and Buyers [i.e., Logan and Smith] hereby state their express understanding and agreement (i) that the cash and other property to be distributed to Seller pursuant to this Section 5 represent cash and property of Pomona for whose value (as would be expressed in the value of the shares) Buyers are unwilling to pay, and which are not necessary to Buyers' operation and continuance of Pomona as a going business; (ii) that such distributions are not intended to be and shall not be treated by any party to this Agreement as a part of the purchase price for the shares, directly or indirectly, or in any fashion a part of the consideration passing from Buyers to Seller, directly or indirectly, with respect to such *100 shares; and (iii) that each such distribution is intended to be and shall be treated by all parties to this Agreement as a distribution by Pomona to Seller, as Pomona's sole shareholder, as a distribution with respect to his stock. Thus, the parties expressly agreed the cash and other property distributed to petitioner be treated as a corporate distribution to petitioner as a stockholder, and not as consideration for his shares. Section 5 went on to provide that the Buyers would endeavor to maintain Pomona's subchapter S status through December 31, 1974. "Section 6. Sellerhs Obligations for Taxes and Certain Fees" provided in part: Should any federal, state or other governmental agency assert, assess or seek to assess against Pomona, Buyers, or any of their respective successors, claims for additional income, license, property or other taxes or fees of any kind owing by Seller or Pomona with respect to operations or periods transpiring prior to the Closing Date (other than taxes or fees shown as a liability of Pomona in this Agreement or in any Schedule or Exhibit to this Agreement), then Seller will, and hereby does agree to, indemnify and hold Pomona, Buyers and their *101 respective successors harmless from and against any costs, tax liabilities or other liabilities of any kind resulting from any of the foregoing; and without limiting the generality of the foregoing, Seller shall pay to Pomona, Buyers or their respective successors, as the case may be, on demand, and in cash, the full amount of all costs and expenses, including attorneys and accountants fees and court costs, incurred in negotiating, protesting or litigating any tax or other liability sought to be imposed upon them, or any of them, by any governmental agency by reason of any of the foregoing, and will also pay or reimburse to Pomona, Buyers or their respective successors as the case may be, the full amount of any taxes or fees actually assessed or awarded against them, or any of them, by reason of any of the foregoing. This section is a standard indemnification clause binding petitioner to reimburse Pomona or the Buyers for any undisclosed pretransfer tax liabilities. However, petitioner's understanding of this almost incomprehensible boilerplate was he would not be liable for income taxes due on Pomona's earnings after closing. Since he was informed by his accountant Pomona showed *102 a small loss through May 31, 1974, he believed he would own no further taxes on Pomona's 1974 earnings. On April 30, 1974, three days before the agreement was signed, petitioner received from Pomona $250,000 in cash; and on May 4, 1974, he received in addition a Cadillac sedan worth $3,450 and an insurance policy on his life with a cash surrender value of $6,769.22. On May 14 and May 31, 1974, petitioner received further cash distributions with respect to previously earned receivables.[2]
The parties executed an "Amendment of Purchase Agreement" and closed their transaction on May 31, 1974. At closing, petitioner transferred all his shares in Pomona to the Buyers and received initial payments on the $200,000 sales price and on a $68,000, five-year convenant not to compete. For its taxable year ending December 31, 1974, Pomona had current earnings and profits of $114,920. Pomona's subchapter S election was continued by the Buyers throughout 1974. During that year Don Logan, one of the Buyers, received a distribution from Pomona of $3,443. Petitioner on his 1974 income tax return, prepared by his accountant, treated the distributions made prior to closing as tax-free receipts *103 of previously taxed income. Petitioner chose to report the sale of his Pomona stock on the installment method; however, he overstated his gain through neglecting to make any adjustment in his stock basis for undistributed taxable income he had previously included under the subchapter S rules. In 1977 petitioner reacquired the stock of Pomona after the Buyers defaulted under the terms of the purchase agreement. In his statutory notice, respondent increased petitioner's taxable income for 1974 by $113,359, treating the $250,000 distribution as a dividend to the extent of petitioner's pro rata share of Pomona's 1974 current earnings and profits. [3] Respondent further treated petitioner's receipt of an automobile and an insurance policy as dividend income to the extent of Pomona's $7,925 accumulated earnings and profits.At trial, the parties stipulated that should respondent prevail, petitioner would have a long-term capital loss on the stock sale of $102,344, reflecting his increased stock basis. *104 OPINION Petitioner sold his subchapter S corporation, Pomoa Tank Line, Inc. (Pomona), to Larry Smith and Don Logan (the Buyers) in 1974. The transaction took the form of a stock sale. Prior to the sale and four moths into Pomona's taxable year petitioner received $250,000, a Cadillac sedan, and an insurance policy on his life with a stated cash surrender value. Because petitioner believed these receipts were to be tax free under section 1375(d), the parties' purchase agreement expressly provided that the receipts would be treated as corporate distributions and not as part of the sales price. No private letter ruling from respondent was asked for or issued. Treating the distributions to petitioner under sections 301 and 316, respondent determined that petitioner had received $121,284 in dividends from Pomona out of current and accumulated earnings and profits. The issues to be decided are (1) whether petitioner's receipt of a $250,000 cash distribution from his wholly owned subschapter S corporation is taxable as a dividend to the extent of petitioner's pro rata share of the corporation's current earning and profits for the year of distribution or whether the distribution *105 is deemed first out of previously taxed income, and (2) whether a life insurance policy with a stated cash surrender value constitutes "money" or "property other than money" for purposes of section 1.1375-4, Income Tax Regs.
The first issue requires us to determine the proper characterization of amounts distributed out of an electing small business corporation. This problem can best be understood in the context of a brief outline of the provisions of subchapter S relating to distributions and constructive dividends. See generally Clark v. Commissioner, 58 T.C. 94, 99-100 (1972). Subchapter S of the Code, secs. 1371-1379, was enacted "[to] permit shareholders in small-business corporations, in lieu of payment of the corporate tax, to elect to be taxed directly on the corporation's earnings." S. Rept. No. 1983, 85th Cong., 2d Sess., 1958-3 C.B. 922, 1008. Thus, except with respect to certain capital gains, a subchapter S corporation is not subject to income taxes. Sec. 1372(b)(1). [4]
*106 Instead, the shareholders are taxed on their pro rata shares of the corporation's "undistributed taxable income." Sec. 1373(a) and (b). [5] This income may later be distributed to the shareholders as a tax-free return of capital to the extent they have already included it in in their incomes. Sec. 1375(d)(1). [6]Section 1376(a) completes this structure at the shareholder level, providing that a shareholder's basis be increased by the amount of undistributed taxable income he is required to include in his gross income. [7]
*107 Petitioner contends the $250,000 he received from Pomona with respect to his stock should be treated under section 1375(d) as a nondividend distribution of previously taxed income. He also contends that where respondent's regulations require a different result, they are invalid because they are not in harmony with the overall structure of subchapter S. Respondent argues that to the extent of Pomona's 1974 earnings and profits, the cash distributions must first be treated as actual dividends. We agree with respondent. The regulations clearly and abundantly support respondent's position. Section 1.1372-1(c), Income Tax Regs., states, "to the extent that other provisions of chapter 1 of the Code are not inconsistent with those under subchapter S of such chapter and the regulations thereunder, such provisions will apply with respect to both the electing small business corporation and its shareholders in the same manner that they would apply had no election been made." That same regulation goes on to state, "Section 301, relating to distributions of property, applies to distributions by an electing small business corporation in the same manner that it would apply had no election been *108 made." Sec. 1.1372-1(c)(2), Income Tax Regs. It cannot be too often repeated that, as these regulations provide, despite its special rules a subchapter S corporation is still a corporation for tax purposes. See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 6.01, at 6-4 to 6-5 (4th ed. 1979). With respect to the issue in this case, section 1.1375-4(b), Income Tax Regs., is squarely on point and holds, "since current earnings and profits are first applied to distributions of money * * * a distribution of previously taxed income may occur only if during its taxable year the corporation makes such money distributions in excess of its earnings and profits for such taxable year." This regulation follows the position taken in section 1.1373-1(d), Income Tax Regs., which holds, "In applying section 316(a) to distributions by an electing small business corporation, earnings and profits of the taxable year are first allocated to actual distributions of money made during such taxable year * * *." Thus, distributions of money are treated as having been made first out of current earnings before they are considered distributions of previously taxed income.
*109 Generally, Treasury regulations must be sustained unless they are plainly inconsistent with the statute, Bingler v. Johnson, 394 U.S. 741, 750 and cases cited (1969). Moreover, section 1375(d) expressly authorizes the Secretary to issue regulations governing nondividend distributions of previously taxed income. Thus, the legislative regulations under that section have the force and effect of law unless they constitute an arbitrary and capricious abuse of discretion. Batterton v. Francis, 432 U.S. 416, 424-426 (1977). Besides being legislatively mandated, we think respondent's regulations under section 1375(d) are reasonable. See DeTreville v. United States, 445 F.2d 1306 (4th Cir. 1971); Attebury v. United States, 430 F.2d 1162 (5th Cir. 1970). Those regulations, which provide that cash distributions are first considered distributions of current earnings and profits, parallel the definition of undistributed taxable income. Section 1373(c) provides: Undistributed Taxable Income Defined.--For purposes of this section, the term "undistributed taxable income" means taxable income (computed as provided in subsection *110 (d)) minus the sum of (1) the taxes imposed by sections 56 and 1378(a) and (2)the amount of money distributed as dividends during the taxable year, to the extent that any such amount is a distribution out of earnings and profits of the taxable year as specified in section 316(a)(2). [Emphasis added.] Thus, undistributed taxable income is determined only after cash dividends out of current earnings are first taken into account, and the same rule is applied before the amount of previously taxed income distributed is determined. The final link in this statutory chain, and the key to understanding petitioner's problems in this case, is that section 316(a)(2) refers to dividends out of current earnings. Section 316(a)(2) treats as dividends amounts distributed by a corporation to its shareholders-- out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. [Emphasis added.] This definition of a dividend out of current earnings makes it clear that *111 a distribution may turn out to be a dividend by the end of the corporate taxable year even though there were no current earnings and profit when the distribution was made. See sec. 1.316-2(b), Income Tax Regs.; Bitter and Eustice, supra, par. 7.02, at 7-5. Cf. Anderson v. Commissioner, 67 T.C. 522, 553-570 (1976); Smull v. Commissioner, 17 T.C. 1393 (1952). This is what happened to petitioner in this case. He received a distribution from a corporation before it had any earnings in that year, but by the end of the year current earnings were sufficient to require that a substantial part of petitioner's receipts be treated as dividend income under sections 301(c)(1) and 316(a)(2). Since cash distributions to petitioner ($250,000) and Don Logan ($3,443) exceeded Pomona's current earnings for 1974, respondent allocated those earnings pro rata among the cash distributions for that year under section 1.316-2(b) and section 1.1373-1(d), Income Tax Regs.[8] Thus of Pomona's 1974 earnings of $114,920, $1113,359 was treated as dividend income to petitioner because he received $250,000 out of total 1974 cash distributions of $253,443. *112 We cannot accept petitioner's suggestions that we judicially modify section 1.1375-4(b) of the regulations, making a special exception for a shareholder of a subchapter S corporation who terminates his interest during the corporation's taxable year. There is no need to do so because many routes to tax-free capital treatment of withdrawals are already available to a terminating subchapter S shareholder. Had petitioner sold his stock for an additional $250,000 or had Pomona redeemed that amount of his stock in connection with the sale, these receipts would have been almost entirely tax free because of his increased basis in his stock. However, petitioner relied on his accountant's assurances and in a complex tax area chose a particular path resulting in substantial unforeseen dividend income. See, e.g., Pollack v. Commissioner, 47 T.C. 92 (1966). See also Cohen v. Commissioner, 63 T.C. 527 (1975), affd. without published opinion 532 F.2d 745 (3d Cir. 1976). We will not correct petitioner's error at this point by invalidating a legislative regulation. Petitioner, however, further argues that the intentions of the parties under their agreement *113 should control the tax results. Thus, he contends that because section 6 of the purchase agreement provided the Buyers would be responsible for taxes on income earned after the transaction was closed, he should not be taxed on Pomona's 1974 earnings. [9] Respondent argues that he cannot be bound by any agreement shifting the burdens of taxation to which he was not a party. We agree with respondent for the reasons below.
*114 To begin with, section 6 of the purchase agreement does not state that the Buyers would pay all taxes imposed on Pomona's post-transfer earnings. Instead, a careful reading of section 6, quoted in our findings of fact, reveals that the section obligates petitioner to pay any additional undisclosed taxes that might be imposed with respect to Pomona's pretransfer operations. Petitioner apparently believed that the Buyers would be taxed on Pomona's post-transfer earnings under section 1373(b) as Pomona's yearend shareholders. He was wrong because, as we have shown, actual cash distributions exceeded Pomona's 1974 earnings and constituted dividend income to him to the extent of his pro rata share thereof. Moreover, section 6 of the purchase agreement must be read in conjunction with the "RECITALS" section and section 5 of the agreement. Therein the agreement unequivocally provided that the pretransfer distributions: shall be taxed directly to Seller, as distributions to a shareholder by a Subchapter S corporation, pursuant to Subchapter S of the Code and applicable Treasury regulations issued thereunder, or under such other statutes and regulations as may be applicable *115 under the circumstances to distributions by a corporation to a shareholder with respect to his stock; * * * To support his position petitioner cites a number of cases to the effect that, absent a sham, the form chosen by the parties controls the tax results. E.g., Lewis and Taylor, Inc. v. Commissioner, 447 F.2d 1074 (9th Cir. 1971). These cases are of no help to petitioner because the parties in their agreement explicitly cast the $250,000 distribution in the form of a dividend. Finally, even had the Buyers agreed to pay any taxes that might be imposed on petitioner with respect to Pomona's posttransfer earnings, respondent could not be bound thereby. Respondent issued no ruling as to the tax consequences of distributions made under the purchase agreement. It is fundamental that an agreement to which respondent is not a party cannot force him to collect taxes from someone other than the person upon whom taxes are imposed. Neeman v. Commissioner, 13 T.C. 397 (1949), affd. per curiam 200 F.2d 560 (2d Cir. 1952), cert. denied *116 345 U.S. 956 (1953). See sec. 6301. [10]
For the foregoing reasons, we hold that the $250,000 petitioner received from Pomona prior to the sale of his stock constitutes dividend income to the extent of his pro rata share of Pomona's earnings and profits for the taxable year of distribution. The second issue in this case is whether the life insurance policy with a cash surrender value distributed to petitioner by Pomona constitutes "money" or "property other than money" for purposes of section 1.1375-4(b), Income Tax Regs. If "money," the life insurance policy would not substantially increase the amount of dividend income taxed to petitioner and, thus, would be largely treated as a distribution of previously taxed income under section 1375(d). [11] If, on the other hand, the life insurance policy is considered a distribution of "property other than money," it could not be considered a distribution of previously taxed income. Sec. 1.1375-4(b), Income Tax Regs.[12] For that reason the insurance policy together with the automobile, *117 which petitioner concedes is "property other than money," would be considered as dividend distributions to the extent of Pomona's accumulated earnings and profits under sections 316(a)(1), 301(c)(1), and 301(b)(1)(A). See sec. 1.1373-1(g), example (4), and sec. 1.1375-4(g), example (4), Income Tax Regs. Petitioner's arguments that the cash surrender value of an insurance policy on his life constitutes "money" are relatively opaque. Respondent argues that the plain meaning and ordinary usage of the term "money" excludes the cash value of an insurance policy. We agree with respondent. We first note that that portion of section 1.1375-4(b) of the regulations which provides only distributions of moeny may be considered previously taxed income has been repeatedly held valid by this and other Courts. *118 DeTreville v. United States, 445 F.2d 1306 (4th Cir. 1971); Attebury v. United States, 430 F.2d 1162 (5th Cir. 1970); Fountain v. Commissioner, 59 T.C. 696 (1973); Clark v. Commissioner, 58 T.C. 94 (1972). More importantly, we do not believe an insurance policy can be considered "money" as that term is ordinarily used. In Clark v. Commissioner, supra, we held negotiable demand notes of the distributing corporation were not "money," and in Fountain v. Commissioner, supra, we held checks that were never cashed but were endorsed back to the distributing corporation as loans were not "money." We think an insurance policy is much less like "money" than is a demand obligation. Having a cash surrender value does not make an insurance policy "money" any more than an automobile is "money," and petitioner has agreed that the Cadillac he received was "property other than money" even though it, too, had an ascertainable value. It is clear that an insurance policy must be "property other than money," under section 1.1375-4(b), Income Tax Regs., and we so hold. We therefore find that *119 the insurance policy together with the automobile constituted dividend income to petitioner to the extent of Pomona's accumulated earnings and profits. To reflect concessions and the foregoing, Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references will be to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.↩
2. The amount of additional distributions was fixed by an amendment to the purchase agreement at closing, and further adjusted in a final adjustment between the parties dated September 19, 1974. Because of our dispostition of this case and concessions, the dollar amounts are not relevant.↩
3. Respondent does not contend that the distributions in respect of earned accounts receivable constituted dividend income and apparently concedes these items to be capital. See note 2, supra↩.
4. Sec. 1372(b). Effect.--If a small business corporation makes an election under subsection (a), then-- (1) with respect to the taxable years of the corporation for which such election is in effect, such corporation shall not be subject to the taxes imposed by this chapter (other than the tax imposed by section 1378↩) * * *.
5. SEC. 1373. CORPORATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS. (a) General Rule.--The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. (b) Amount Included in Gross Income.--Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation. ↩
6. Sec. 1375(d) Distributions of Undistributed Taxable Income Previously Taxed to Shareholders.-- (1) Distributions not considered as dividends.--An electing small business corporation may distribute, in accordance with regulations prescribed by the Secretary or his delegate, to any shareholder all or any portion of the shareholder's net share of the corporation's undistributed taxable income for taxable years prior to the taxable year in which such distribution is made. Any such distribution shall, for purposes of this chapter, be considered a distribution which is not a dividend, but the earnings and profits of the corporation shall not be reduced by reason of any such distribution. ↩
7. SEC. 1376. ADJUSTMENT TO BASIS OF STOCK OF, AND INDEBTEDNESS OWING, SHAREHOLDERS. (a) Increase in Basis of Stock for Amounts Treated as Dividends.--The basis of a shareholder's stock in an electing small business corporation shall be increased by the amount required to be included in the gross income of such shareholder under section 1373(b), but only to the extent to which such amount is included in his gross income in his return, increased or decreased by any adjustment of such amount in any redetermination of the shareholder's tax liability. Since sec. 1375(d)(1) provides that distributions of previously taxed income are not treated as dividends, a shareholder's basis is reduced to reflect such distributions under sec. 301(c)(2). Sec. 1.1375-4(a), Income Tax Regs.↩
8. Sec. 1.1373-1(d) provides in part: If * * * distributions of money made during the taxable year exceed the earnings and profits of such year, then that proportion of each such distribution which the total of the earnings and profits of the year bears to the total of such distributions made during the year shall be regarded as out of the earnings and profits of that year.↩
9. On petitioner's reply brief he also suggests, without discussion, that even if subchapter C applies to the distribution in question, the distribution was not essentially equivalent to a dividend and the agreement in substance provided for a partial redemption for cash coupled with an installment sale. We do not consider this argument to be properly before us. Even if it were before us, the record in this case would be insufficient to support a finding for petitioner.See sec. 302(c)(1). The issue is raised too late because petitioner's consistent position in his opening brief, at trial, on his 1974 return, and indeed in the agreement itself was that he received a distribution from Pomona as a stockholder preceeding the exchange with the Buyers. In addition, the parties have stipulated that: "Pursuant to the terms of the agreement, petitioner was to receive [the $250,000, the car, and the insurance policy] from PTL [Pomona] as a distribution with respect to his stock, but prior to the transfer of his stock." The stipulation of all relevant matters of fact or mixed law and fact to the fullest extent possible is fundamental to this Court's efficient performance of its judicial function, and such stipulations are treated as conclusive admissions by the parties for purposes of the case in which made. Rule 91(a), (e), and (f), Tax Court Rules of Practice and Procedure.↩
10. SEC. 6301. COLLECTION AUTHORITY. The Secretary or his delegate shall collect the taxes imposed by the internal revenue laws.↩
11. That is, the increase in money received would not significantly increase petitioner's fractional share of 1974 earnings. See n. 8, supra↩, and accompanying text. 12. Sec. 1.1375-4(b), Income Tax Regs.↩, provides in part: "a distribution of property other than money * * * is never a distribution of previously taxed income."