ESTATE OF WARD T. MCWHORTER, DECEASED, LYNN MABRY AND CLAYTON W. MCWHORTER, CO-EXECUTORS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6653–74—6655–74.     Filed February 2, 1978.

*E. J. Ball*, for the petitioners.
*Thomas J. Miller*, for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes:

---

[1] The following cases are consolidated herewith: Ozark Supply Co., docket No. 6654–74; Clayton W. McWhorter and Michael S. McWhorter, docket No. 6655–74.

| Petitioner | TYE— | Amount |
|---|---|---|
| Estate of Ward T. McWhorter, docket No. 6653–74[2] | 12/31/70 | $12,637.59 |
| | 12/31/71 | 285.89 |
| Ozark Supply Co., docket No. 6654–74 | 9/30/71 | 28,865.05 |
| | 9/30/72 | 61,438.88 |
| Clayton and Michael McWhorter, docket No. 6655–74 | 12/31/70 | 15,218.84 |
| | 12/31/71 | 89.48 |

There are two issues remaining for our resolution. First, we must decide whether notes distributed by Ozark Supply Co. (hereinafter Ozark) to its shareholders on the first day following the termination of its subchapter S status, pursuant to a declaration of dividend adopted prior to the termination of Ozark's subchapter S status, constituted a return of capital or whether it constituted distributions of current and accumulated earnings and profits. If we conclude, as petitioners argue, that the distributions were a return of capital, petitioners in docket Nos. 6653–74 and 6655–74 will not be required to include dividend income from Ozark in their 1970 income.

Second, we must decide if the purchase of Benton County Enterprises, Inc. (hereinafter referred to as Benton), stock by Ozark, followed by a merger of Benton into Ozark constituted an F reorganization as contended by petitioners or whether it constituted a liquidation under section 332,[3] to which section 334(b)(2) applies as contended by respondent. Should we hold for petitioners on this issue, Ozark will be entitled, under sections 381(a) and 381(c)(1), to use Benton's net operating loss carryover to offset post-merger income. Further, under section 362(b), Ozark will have a carryover basis in the assets acquired from Benton.

---

[2] The notice of deficiency in docket No. 6653–74 was issued to W. T. McWhorter and his wife Gladys on June 7, 1974. Gladys McWhorter died on Feb. 25, 1973, with all of her property passing to W. T. McWhorter who subsequently died on Oct. 23, 1974. On Jan. 29, 1975, Gladys McWhorter was dismissed as a party since no one was legally entitled to represent her estate. Additionally, the Estate of W. T. McWhorter, Lynn Mabry and Clayton McWhorter, coexecutors, was substituted for W. T. McWhorter as party petitioner.

[3] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in question.

## FINDINGS OF FACT

All of the facts were stipulated and are found accordingly.

Ozark, an Arkansas corporation, had its principal place of business in Rogers, Ark., when it filed its petition herein. For its tax years ended September 30, 1971, and September 30, 1972, Ozark filed its Federal income tax returns with the Internal Revenue Service Center, Austin, Tex.

W. T. McWhorter and his wife Gladys, both of whom are now deceased, were residents of Rogers, Ark., when they timely filed their 1970 and 1971 Federal income tax returns with the District Director of Internal Revenue at Little Rock, Ark. W. T. McWhorter resided in Rogers, Ark., when he filed his petition herein.[4]

Clayton W. McWhorter and Michael S. McWhorter, husband and wife, timely filed their 1970 and 1971 joint Federal income tax returns with the District Director at Little Rock, Ark. Clayton and Michael McWhorter resided in Rogers, Ark., when they filed their petition herein.

Ozark was organized in 1965 and since that time has engaged in the distribution of veterinary supplies in Arkansas. From the time of its organization through its tax year ended September 30, 1970, Ozark had 800 shares of common stock issued and outstanding. During this period, Gladys McWhorter owned 120 shares, W. T. McWhorter owned 230 shares, and their son, Clayton McWhorter, owned 450 shares. From its inception through September 30, 1970, Ozark was operated as an electing small business corporation, or subchapter S corporation, under the provisions of sections 1371 through 1379.

At the close of each tax year Ozark, by journal entry, credited each shareholder with his respective share of the corporation's income. For the 3 years ending September 30, 1968, 1969, and 1970, Ozark credited the shareholders with the following total amounts of income: W. T., $38,159.14; Gladys, $19,909.13; and Clayton, $74,659.21. During the same period Ozark paid cash dividends of $24,483.15 to W. T.; $6,200.83 to Gladys; and $18,085.96 to Clayton. At the close of each tax year Ozark calculated each shareholder's undistributed taxable income (hereinafter referred to as UTI) and by journal entry credited it

---

[4]As noted above at n. 2, the Estate of Ward T. McWhorter has been substituted for W. T. McWhorter as the petitioner in docket No. 6653–74.

to the shareholder's UTI account. On September 30, 1970, the corporation had $130,856.54 of UTI allocated to the shareholders as follows: W. T., $35,449.58; Gladys, $24,113.04; and Clayton, $71,293.92. On October 1, 1970, Ozark had $26,712.14 cash on hand.

On August 28, 1970, Ozark held a regular directors meeting at which the directors noted their desire to pay dividends to shareholders as of September 30, 1970, from the shareholders' UTI accounts. Because the company did not have adequate cash available from which to pay dividends, however, the following resolution was adopted:

> RESOLVED, to issue unsecured promissory notes to the shareholders dated October 1, 1970, due on October 1973 and bearing interest at the rate of six (6) percent per annum in amounts equal to the shareholders undistributed taxable income as determined on the Company's books and records as of September 30, 1970 in consideration for and for payment of dividends declared this date by this board of directors, and be it further
>
> RESOLVED, that this Board hereby declares a dividend equal to all shareholders' undistributed taxable income as determined on the books and records of the Company as of September 30, 1970, payable October 1, 1970 to stockholders of record on September 30, 1970.

Pursuant to this resolution, promissory notes were issued to the three shareholders on October 1, 1970. The face amount of these promissory notes, representing an amount equal to the undistributed taxable income credited to each shareholder's account was as follows: $35,449.58 payable to W. T. McWhorter; $71,293.92 payable to Clayton W. McWhorter; and $24,113.04 payable to Gladys McWhorter. Ozark's shareholders did not have a regular practice of loaning the corporation amounts equal to the shareholders' UTI.

During its tax years ending September 30, 1971, and September 30, 1972, Ozark made the following payments on the notes issued October 1, 1970:

| | | | Amount of principal |
| Shareholders | Sept. 30, 1971 | Sept. 30, 1972 | unpaid on 9/30/72 |
|---|---|---|---|
| W. T. McWhorter | $1,000 | $449.58 | $34,000 |
| Gladys McWhorter | 0 | 113.04 | 24,000 |
| Clayton McWhorter | 0 | 7,293.92 | 64,000 |

Also, on October 1, 1970, Ozark voluntarily revoked its subchapter S election. On October 28, 1970, as part of the process of ending its subchapter S election, Clayton W. McWhorter, Ozark's president, wrote to the Internal Revenue Service stating

that Ozark revoked its election under section 1372(a) and the revocation was effective for the tax year beginning October 1, 1970. All shareholders consented to this revocation. On December 31, 1970, Ozark received a response from the Internal Revenue Service stating that Ozark's revocation of its election to be treated as a small business corporation was effective October 1, 1970.

On October 2, 1970, Gladys and W. T. McWhorter sold their entire interest in Ozark to Clayton and Michael McWhorter. Since October 2, 1970, Clayton McWhorter has owned 450 shares of the total 800 outstanding shares of Ozark stock, and Clayton and Michael have jointly owned the remaining 350 outstanding shares of Ozark stock.

On April 12, 1971, Clayton McWhorter, in his capacity as Ozark's president, entered into an agreement with the shareholders of Benton County Enterprises, Inc., to purchase all of Benton's issued and outstanding stock. The purchase price of the Benton stock totaled $75,000, plus the assumption of certain liabilities. Pursuant to the purchase agreement Ozark became Benton's sole shareholder as of April 12, 1971. Prior to that time Ozark owned no stock in Benton. The parties have stipulated that the transaction between Ozark and Benton's shareholders constituted a purchase within the meaning of section 334(b)(3).

Benton, an Arkansas corporation, was engaged in the production of hogs for market in northwest Arkansas. On April 30, 1971, the book value of all of Benton's assets, other than cash or its equivalent, was $194,759.92. As of April 30, 1971, Benton had a net operating loss of $141,777.16.

On April 30, 1971, Ozark and Benton adopted a plan of merger. Under the merger agreement Ozark continued in existence, Benton's assets were transferred to Ozark, Benton's obligations were assumed by Ozark, and Benton's capital stock was canceled on May 1, 1971. It was intended that the merger would be governed by the corporate laws of the State of Arkansas and would constitute a statutory merger within the meaning of section 368(a)(1)(A). As contemplated, the merger occurred on April 30, 1971. As a result of the merger, Ozark, on its Federal income tax return for the year ending September 30, 1971, reported a net operating loss carryover from its merged subsidiary, Benton, in the amount of $141,777.16. Of this amount, Ozark deducted $29,260.19 on its income tax return for

the tax year ending September 30, 1971, and carried over $112,516.97 to its tax year ending September 30, 1972. On its Federal income tax return for the period ending September 30, 1972, Ozark deducted the remaining $112,516.97.

In the notice of deficiency issued to Ozark, respondent disallowed Ozark's net operating loss deduction claimed in 1971 and 1972.

In the notices of deficiency issued to Ozark's shareholders, respondent determined that the distributions occurring on October 1, 1970, were dividends to the extent of current and accumulated earnings and profits and not distributions of previously taxed income.

## OPINION[5]

There are two issues we must resolve. First, we must decide whether distributions to Ozark's shareholders were a return of capital or whether they were distributions of earnings and profits. If the former, the distributions will reduce the basis of the shareholders' stock.[6] If the latter, the shareholders will be required to include additional dividend income in their 1970 Federal income tax returns.

The second issue we must decide is whether the purchase of Benton stock followed by the merger of Benton into Ozark constituted an F reorganization as alleged by petitioners[7] or whether it constituted a liquidation under section 332, in which the basis of the distributed assets is determined under section 334(b)(2). If the transaction constituted a reorganization,

---

[5]"Petitioners" in the first issue of this opinion refers to Clayton McWhorter, Michael McWhorter, and the Estate of Ward T. McWhorter. In the second issue of this opinion "petitioner" refers to Ozark Supply Co.

[6]Petitioners do not contend the Oct. 1, 1970, distributions were distributions of UTI, which under limited circumstances, are nontaxable. See sec. 1375(d), (f). Presumably, petitioners do not rely on sec. 1375 since distributions under subsecs. (d) and (f) must be made in cash. See secs. 1.1375-4(b) and 1.1375-6(a) and (b), Income Tax Regs.; *Attebury v. United States,* 430 F.2d 1162 (5th Cir. 1970); *McKelvy v. United States,* 478 F.2d 1217 (Ct. Cl. 1973); *Stein v. Commissioner,* 65 T.C. 336 (1975). Rather, petitioners contend the Oct. 1, 1970, distributions were distributions of property constructively occurring prior to Oct. 1, 1970, during a year in which Ozark had no earnings and profits, either current or accumulated. Consequently, petitioners contend that under sec. 301(c)(2) the distributions acted merely to reduce the shareholders' basis in their Ozark stock, *equal* in amount to their UTI balances.

[7]Petitioners on brief never argue that the liquidation of Benton into Ozark constituted an A reorganization. This is in marked contrast to exhibit 4-D, the plan of merger drafted at the time of merger, which specifically states the merger shall "constitute a Statutory Merger * * * within the meaning of Section 368(a)(1)(A)." As explained hereinafter, however, we conclude the merger failed to qualify as a reorganization under any definition found in sec. 368.

petitioners will be allowed to use Benton's net operating losses, incurred prior to the merger of Benton into Ozark, to reduce Ozark's 1971 and 1972 income.

From its inception until its tax year ending September 30, 1970, Ozark was an electing small business corporation under the provisions of sections 1371 through 1379. Through October 1, 1970, its only shareholders were W. T. McWhorter, his wife Gladys, and their son Clayton. Beginning October 1, 1970, Ozark's election to be treated as a subchapter S corporation was voluntarily terminated.

On September 30, 1970, the last day Ozark qualified as an electing corporation, Ozark had UTI of $130,856.54. Prior to the termination of its subchapter S status, Ozark's board of directors, at a regular directors meeting held August 28, 1970, noted that they wanted to pay dividends from the shareholders' UTI accounts. They further noted, however, that the corporation, which had $26,712.14 cash on hand, did not have sufficient money available from which to pay dividends equal to the full amount of each shareholder's UTI account. Having made the decision to pay dividends from the shareholders' UTI accounts, yet lacking sufficient cash reserves from which to pay such dividends, the board of directors resolved—

to issue unsecured promissory notes to the shareholders dated October 1, 1970, due on October, 1973 * * * in amounts equal to the shareholders undistributed taxable income as determined on the Company's books and records as of September 30, 1970 in consideration for and for payment of dividends declared this date * * *

Following this resolution notes were issued to Ozark's three shareholders on October 1, 1970, in amounts equal to the balances in their UTI accounts.

As a result of this transaction, respondent alleges that, on October 1, 1970, Ozark's shareholders received property distributions that in part constituted dividends which they failed to report on their 1970 Federal income tax returns.[8]

In contrast, petitioners contend the declaration of dividend on

---

[8]Respondent contends that approximately 48 percent of the distributions—that portion of the distributions out of earnings and profits—were dividends. The remaining portion of the distributions constituted a return of capital. Respondent determined this 48 percent figure by noting that from Oct. 1, 1970, through Dec. 31, 1970, Ozark made distributions of $130,542.34. As of Sept. 30, 1970, Ozark had accumulated earnings and profits of $3,823.20; during the year ended Sept. 30, 1971, Ozark had current earnings of $59,148.99. Consequently, approximately 48 percent of the distributions made to petitioners, if made after Sept. 30, 1970, were from current or accumulated earnings and profits.

August 28, 1970, created a debtor-creditor relationship between Ozark and its shareholders as of September 30, 1970. The distributions, which petitioners argue constructively occurred on September 30, 1970, were distributions of property equal in amount to each shareholder's UTI account. Further, argue petitioners, since Ozark had no earnings and profits, either accumulated or current as of September 30, 1970, the distributions occurring on September 30, 1970, acted, under section 301(c)(2), merely to reduce the shareholders' bases in their stock.[9] Petitioners explain the promissory notes, dated October 1, 1970, as a loan to the corporation of amounts constructively distributed to the shareholders on September 30, 1970.

The resolution of this first issue therefore turns on whether Ozark made property distributions on October 1, 1970, as contended by respondent, or whether the property distributions constructively occurred on September 30, 1970.

In support of their argument that the property distributions occurred on September 30, 1970, petitioners point to the following facts: Each shareholder had a UTI account that, at the end of each tax year, was brought up to date by crediting the shareholder's account with his share of the corporation's income for that year, and was debited by the amount of actual distributions occurring during that year. These journal entries occurring at yearend, combined with the declaration of dividend on August 28, 1970, and the subsequent delivery on October 1, 1970, of the promissory note, indicate the distributions constructively occurred no later than September 30, 1970, the close of Ozark's taxable year.

To support their position that the property distributions constructively occurred on September 30, 1970, petitioners rely on *Roe v. Commissioner*, 192 F.2d 398 (5th Cir. 1951); and *Zimco Electric Supply Co. v. Commissioner*, T.C. Memo. 1971–215. Petitioners' reliance on *Roe* and *Zimco* is misplaced.

The pertinent facts in *Roe* are distinguishable from the facts before us. In *Roe*, Cummer Lime's board of directors declared a

---

[9]Petitioners contend that Ozark had no earnings and profits as of Sept. 30, 1970. Respondent's notice of deficiency, however, indicates Ozark had current earnings and profits for its tax year ending Sept. 30, 1971, of $59,148.99, and accumulated earnings and profits of $3,823.20. In joint stipulation 35, petitioners agree that should we conclude the distributions occurred on Oct. 1, 1970, and were dividends to the extent of earnings and profits, respondent's determination of tax liability is correct. Therefore, we must assume that even if the distributions occurred on Sept. 30, 1970, rather than Oct. 1, 1970, $3,823.20 of the distributions would constitute dividend income.

dividend of $1,800,000 on February 9, 1926. At that time the corporation's surplus account was charged in the amount of $1,800,000, individual shareholder's accounts were credited with their pro rata shares, and the corporation carried the shareholder balances as "accounts payable" on the company books. Thereafter, payments on these accounts payable were made from time to time. The issue involved in *Roe* was whether payments in 1943 to 1945, pursuant to the 1926 resolution, should be treated as dividends received in 1943 through 1945, or whether they were payments made on debts due the shareholders since 1926 when the dividend was declared and constructively paid.

The United States Court of Appeals for the Fifth Circuit, in holding the payments were on a debt created by the 1926 declaration of dividend, recognized that resolution of the problem was "not without difficulty." Nevertheless, the court concluded that the facts established a debtor-creditor relationship created in 1926. Of particular importance to that court's decision was the finding that credits were made to the shareholder accounts "and at all times since have appeared on the books of the company as 'accounts payable' to the stockholders, and that thereafter from time to time Cummer Lime made payments to the stockholders on these accounts payable and has at all times and for all purposes looked upon and treated them as accounts payable." *Roe v. Commissioner*, 192 F.2d 398, 402 n. 8 (5th Cir. 1951). See also *Roe v. Commissioner, supra* at 400 n. 3. We have no similar facts in the case before us that establish a debtor-creditor relationship.

Although there was a declaration of dividend on August 28, 1970, payment did not occur until October 1, 1970. There is no evidence as in *Roe* that Ozark carried a dividend liability as "accounts payable" on its books commencing September 30, 1970, as petitioners would like us to believe. Without such an acknowledged liability similar to accounts payable, it is impossible for us to conclude that Ozark and its shareholders entered into a creditor-debtor relationship on September 30, 1970.[10] Our conclusion in this matter is further supported by Ozark's failure to issue promissory notes to its shareholders until October 1,

---

[10]The only accounts established by the corporation were UTI accounts, and there is no legal obligation for subch. S corporations to distribute the balance of these accounts.

1970. Had Ozark intended to enter into a creditor-debtor relationship on September 30, 1970, it could easily have distributed the notes on that date rather than the following day.

Petitioners' reliance on *Zimco* is also unfounded. Zimco, a subchapter S corporation, had its election terminated on November 1, 1963. On January 4, 1964, Zimco executed a 1-year promissory note to J. B. Zimmerman, Jr. The Commissioner argued Zimmerman received a dividend on January 4, 1964. Zimmerman argued that on October 31, 1963, he received a constructive distribution which he then immediately loaned to Zimco. The January 4, 1964, promissory note merely evidenced the debt created on October 31, 1963.

In *Zimco* we relied heavily on Zimco's history of borrowing money from its shareholders. Corporate minutes indicated that undistributed earnings were the source of these loans, and in each case promissory notes were issued. Further, on December 5, 1963, the shareholders clearly adopted a policy of continuing to lend the corporation UTI. We have no similar facts before us. The parties have stipulated that Ozark's shareholders did not have a regular practice of loaning the corporation their UTI. Indeed, petitioners do not contend that any other such loans were ever made to the corporation.

Rather than follow petitioners' unsupported and complicated interpretation of the events occurring between August 28, 1970, and October 1, 1970, we choose to follow a much more simplified interpretation: On August 28, 1970, Ozark declared a dividend to the shareholders of record on September 30, 1970, payable October 1, 1970. Following this interpretation, the corporate distribution occurred, as argued by respondent, on October 1, 1970, when promissory notes were issued.

In arriving at our conclusion we are supported by *McKelvy v. United States*, 478 F.2d 1217, 1225-1229 (Ct. Cl. 1973); and *Attebury v. United States*, 430 F.2d 1162 (5th Cir. 1970). In both cases taxpayers made constructive receipt arguments similar to that made by petitioners, contending they had constructively received distributions which they loaned back to the corporation. Taxpayers argued that subsequent distributions were merely payments on previously established obligations. The courts in both *McKelvy* and *Attebury* refused to accept the constructive receipt arguments concluding that the constructive receipt doctrine was not available to shareholders of subchapter S

corporations. See *Attebury v. United States, supra* at 1170–1171; and *McKelvy v. United States, supra* at 1227. Indeed, the Fifth Circuit in *Attebury* distinguished its prior decision in *Roe* stating (430 F.2d at 1172):

> Implicit in our decision in *Roe*, as well as the district court's holding in this case, is the inclusion in the shareholder's gross income, when the dividend is declared, of an amount equal to the declared dividends, pursuant to the constructive receipt doctrine. * * * Since we have concluded that the constructive receipt doctrine is inapplicable * * * the *Roe* decision is clearly distinguishable.

In light of the above, we conclude the distributions occurred on October 1, 1970, and were dividends to the extent of earnings and profits.

The second issue we must resolve is whether Ozark's acquisition of Benton followed by the merger of Benton into Ozark constituted an F reorganization. If so, Ozark will be entitled to deduct Benton's pre-merger net operating loss.

On April 12, 1971, Ozark purchased all of Benton's stock for $75,000 and the assumption of liabilities. Prior to that date, Ozark owned no interest in Benton. Ozark's business prior to and following the acquisition of Benton's stock was the distribution of veterinary supplies. Benton was engaged in the production of hogs for market. Following its acquisition by Ozark, Benton continued producing hogs for market.

On April 30, 1971, Benton was merged into Ozark under the laws of Arkansas, Benton's assets were transferred to Ozark, and Benton's stock was canceled. At this time, Benton had a net operating loss of $141,777.16. On its returns for the periods ending September 30, 1971, and September 30, 1972, Ozark claimed net operating loss deductions of $29,260.19 and $112,516.97 as a result of carrying forward Benton's net operating loss. Ozark also carried over Benton's basis in the assets acquired. Petitioner contends this carryover treatment was proper under section 381 since the acquisition and merger of Benton into Ozark constituted an F reorganization. Respondent, however, contends that section 381 is not applicable because the transaction involved a distribution under section 332 in which the basis of the distributed assets was required to be determined under section 334(b)(2).

As authority for its position that the merger of Benton into

Ozark constituted an F reorganization, petitioner relies entirely on Rev. Rul. 75–561, 1975–2 C.B. 129,[11] and the cases cited therein.

---

[11]Rev. Rul. 75–561, 1975–2 C.B. 129, states:

"Rev. Rul. 69–185, 1969–1 C.B. 108, stating that the Internal Revenue Service will not follow the decisions in *Estate of Bernard H. Stauffer v. Commissioner,* 403 F.2d 611 (9th Cir. 1968); *Associated Machine v. Commissioner,* 403 F.2d 622 (9th Cir. 1968), nor that portion of the decision in *J. E. Davant et al. v. Commissioner,* 366 F.2d 874 (5th Cir. 1966), cert. denied, 386 U.S. 1022 (1967), holding that a transaction resulting in the combination of two or more commonly owned operating corporations constitutes a reorganization within the meaning of section 368(a)(1)(F) of the Internal Revenue Code, is hereby revoked in light of the decisions in: *Davant; Stauffer; Associated Machine; Home Construction Corp. of America v. United States,* 439 F.2d 1165 (5th Cir. 1971); *Movielab, Inc. v. United States,* 494 F.2d 693 (Ct. Cl. 1974); *Performance Systems, Inc. v. United States,* 382 F. Supp. 525 (M.D.Tenn. 1973), affd. per curiam 501 F.2d 1338 (6th Cir. 1974); *TFI Companies Inc. v. United States,* No. 73–958–MML (C.D.Cal. Sept. 13, 1974); *Charles C. Chapman Building Co. et al v. United States,* 34 A.F.T.R. 2d 74–6193 (C.D.Cal. 1974); and *Eastern Color Printing Co.* 63 T.C. 27 (1974) (acquiescence, page 1 of this Bulletin).

"In conformance with the rules of these decisions, it is now the position of the Service that the combination of two or more corporations may qualify as a reorganization within the meaning of section 368(a)(1)(F) of the Code, provided certain requirements are satisfied. These requirements are as follows:

"(1) There must be complete identity of shareholders and their proprietary interests in the transferor corporations and acquiring corporations. In the case of wholly-owned subsidiary-into-parent merger, this requirement will be deemed to be satisfied when the shareholders and their proprietary interests in the parent do not change as a result of the merger;

"(2) The transferor corporations and the acquiring corporation must be engaged in the same business activities or integrated activities before the combination; and,

"(3) The business enterprise of the transferor corporations and the acquiring corporation must continue unchanged after the combination.

"Furthermore, it is now the position of the Service that a merger of a wholly-owned subsidiary corporation into its parent which qualifies as a liquidation under section 332 of the Code (to which section 334(b)(2) does not apply) and as a reorganization under section 368(a)(1)(F) constitutes an "F" reorganization, for purposes of section 381(b)(3). See *Movielab, Inc., Performance Systems, Inc.* and *Eastern Color Printing Co.*

"In view of *Stauffer* and *Home Construction,* it is now also the position of the Service that an acquiring corporation in a reorganization qualifying under section 368(a)(1)(F) of the Code which desires to carry back losses arising after the reorganization to a transferor corporation's pre-merger taxable years under section 381(b)(3) must satisfy two requirements:

"(1) it must be able to show that the losses are attributable to a separate business unit or division formerly operated by the transferor corporations; and,

"(2) the transferor corporation must have income in its pre-reorganization taxable years against which such losses can be offset.

"The manner in which the above requirements limit the carry back of losses to the pre-reorganization taxable years of a transferor corporation is illustrated by the following example. Corporation *X,* Corporation *Y* and Corporation *Z* have been owned since their formation by *A,* an individual. Each is engaged in the same business and reports on a calendar year. On December 31, 1972, *X, Y,* and *Z* are merged into a new corporation, *XYZ,* with *A* exchanging his *X, Y,* and *Z* stock for stock of *XYZ. XYZ* continues the same operations as its predecessor or constituent corporations *X, Y,* and *Z.* In its taxable year ended December 31, 1973, *XYZ* has a net operating loss of $70,000, $50,000 of which is attributable to the former business conducted by *X* and $20,000 of which is attributable to the former business of *Y.* For its taxable year ended December 31, 1972, *X* had taxable income of $10,000; for its taxable year ended December 31, 1971, it had taxable income of $15,000; for its taxable year ended December 31, 1970, it had taxable income of $20,000. *Y* had taxable income of $10,000 for its taxable year ended December 31, 1972, and net operating loss in all prior years. *Z* has had taxable income in all years. Applying the rules set forth in the cited Court cases, *XYZ* could carry

Petitioner's reliance on the Commissioner's revenue ruling is misplaced for several reasons. First, by definition[12] a revenue ruling is merely the conclusion of the Internal Revenue Service and is not binding on a court.[13]

Even were we required to follow the Commissioner's rulings, the one relied upon by petitioner simply does not apply to the facts before us. Rev. Rul. 75–561 describes when certain corporate combinations that qualify as A, C, or D reorganizations, or section 332 liquidations (to which section 334(b)(2) does not apply), will also qualify as F reorganizations for purposes of carrying back post-combination losses to pre-combination years under section 381(b)(3). As an initial, although minor point, petitioner does not rely on section 381(b)(3) to carry *back* post-combination losses, rather petitioner relies on section 381(a) and section 381(c)(1) for authority to carry *forward* pre-combination losses.

Of decisive importance, however, Rev. Rul. 75–561, and the cases cited therein, deal with corporate combinations that qualify as A, C, or D reorganizations, or qualify as section 332 liquidations to which the provisions of section 334(b)(2) do not apply. The issue discussed by the revenue ruling is when these transactions will also constitute F reorganizations. Petitioner, however, does not satisfy the fundamental requirements of the ruling: as hereinafter noted in the discussion of section 381, petitioner has failed to show the merger of Benton into Ozark satisfies any of the reorganization definitions or qualifies as a section 332 liquidation to which section 334(b)(2), does not apply.

Not only does petitioner fail to satisfy the underlying requirements of Rev. Rul. 75–561, more importantly, it fails to qualify for carryover treatment provided by section 381.

---

back $45,000 of its net operating loss to the pre-merger years of $X$ and $10,000 of its net operating loss to the pre-merger years of $Y$. The remaining $15,000 of the net operating loss cannot be carried back. It can only be carried forward.

"Pursuant to the authority contained in section 7805(b) of the Code, this Revenue Ruling will not be applied adversely to taxpayers who want to treat their transactions in accord with the position set forth in Rev. Rul. 69–185 and who either have consummated transactions before December 29, 1975, the date of this Internal Revenue Bulletin, or have consummated transactions after that date pursuant to the terms of a binding written contract entered into before that date where such terms are in effect on the date of publications of this Revenue Ruling.

"Rev. Rul. 69–185 is revoked."

[12]As defined in 1975–2 C.B. iii, "Revenue rulings represent the conclusions of the Service on the application of the law to the entire state of facts involved." See also sec. 601.201(a)(6), Proced. & Admin. Regs.

[13]See *Kaiser v. United States*, 262 F.2d 367, 370 (7th Cir. 1958), affd. 363 U.S. 299 (1960).

Basically, section 381 allows carryover treatment of net operating losses under two broad types of corporate combinations. Section 381(a)(1) notes that the first type of corporate combination to which section 381 will apply is a section 332 liquidation (relating to the liquidations of subsidiaries) *"except in a case in which the basis of the assets distributed is determined under section 334(b)(2)."* (Emphasis added.) On its face, the April 30, 1971, liquidation of Benton into Ozark was a liquidation in which the basis of the distributed assets is determined under section 334(b)(2).[14] Property was received by Ozark in complete liquidation of Benton, the distribution was pursuant to a plan of liquidation adopted within 2 years after Ozark purchased Benton's stock, and the Benton stock was acquired by purchase within a 12-month period. Having satisfied the requirements of section 334(b)(2), Ozark's basis in Benton's assets must be determined under that section. Therefore, the merger of Benton into Ozark is not the type of corporate combination contemplated by section 381(a)(1).

Additionally, the merger of Benton into Ozark does not fall within the second type of combination described in section

---

[14]Sec. 334(b)(2) prescribes how the basis of property distributed in liquidation of certain recently acquired subsidiaries shall be determined. Generally, this section incorporated the principles of *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951), cert. denied 342 U.S. 827 (1951), covering the purchase of assets by way of acquiring and liquidating a subsidiary. Sec. 334(b)(2) states:

If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—
(i) on or after June 22, 1954, and
(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and
(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of,
(i) the date of the first acquisition by purchase of such stock, or
(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

381(a)(2). Section 381(a)(2) refers to certain A, C, D, and F reorganizations. One underlying premise of these and all reorganizations is that there is a significant, continuing proprietary interest. Section 1.368–2(a), Income Tax Regs., specifically states, "The term [reorganization] does not embrace the mere purchase by one corporation of the properties of another corporation, for it imports a continuity of interest on the part of the transferor or its shareholders in the properties transferred." See *Cortland Specialty Co. v. Commissioner*, 60 F.2d 937, 940 (2d Cir. 1932), affg. 22 B.T.A. 808 (1931), cert. denied 288 U.S. 599 (1933).

Petitioner clearly has not presented us with facts that indicate a continuing proprietary interest. On April 12, 1971, Ozark, which had previously owned no Benton stock, purchased all of Benton's outstanding stock. Eighteen days later, Benton was liquidated into Ozark. We cannot view the purchase and liquidation as separate, independent steps. As we noted in *Kass v. Commissioner*, 60 T.C. 218, 223 (1973), affd. per order (3d Cir. Jan. 18, 1974), "In short, where the parent's stock interest is 'old and cold,' it may contribute to continuity-of-interest. Where the parent's interest is not 'old and cold,' the sale of shares by the majority of shareholders actually detracts from continuity-of-interest." In the facts before us Ozark's interest in Benton was recently acquired. Further, there has been no showing by petitioner that the stock was not acquired as the first step in a plan to acquire Benton's assets. In view of this, we conclude the underlying continuity-of-proprietary-interest requirement necessary to some extent in every reorganization has not been satisfied. See *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 177–178 (1973). As such, it is impossible for petitioner to fall within the second type of corporate combination described in section 381(a)(2).

Since Ozark's purchase and subsequent liquidation of Benton fails to satisfy either of the types of corporate combinations described in sections 381(a)(1) and 381(a)(2), petitioner is not entitled to the net operating loss carryover it deducted on its 1971 and 1972 Federal income tax returns.

To reflect the foregoing,

*Decisions will be entered for the respondent.*