GERALD D. HANDKE AND SYLVIA F. HANDKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Handke v. Commissioner
Docket No. 24380-86
United States Tax Court
T.C. Memo 1990-273; 1990 Tax Ct. Memo LEXIS 291; 59 T.C.M. (CCH) 766; T.C.M. (RIA) 90273; May 31, 1990, Filed *291 Decision will be entered under Rule 155. Patrick Murray, for the petitioners. Gail K. Gibson and Mary E. Pierce, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to tax under section
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(b)
6661
1978
$  65,654
--
--
$ 32,827
--
1979
17,114
--
--
8,557
--
1980
22,104
--
--
11,052
--
1981
51,264
--
--
27,309
--
1982
576,171
$ 28,809
*
--  $ 57,617
After mutual concessions, the issues are petitioners' liability for Federal income taxes resulting from alleged improper treatment of items of income and expense by petitioner's wholly owned subchapter S corporation for the years 1978 through 1982, and petitioners' liability for the fraud additions under section 6653(b) for the years 1978 through 1981. All section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners resided in St. Paul, Minnesota *292 when they filed their petition. All references to petitioner in the singular are to Gerald D. Handke. Petitioner has a bachelor's degree in business and economics from Hamline University. He is the president, chief executive officer, and sole shareholder of Handke Grain Service, Inc. (the corporation), a subchapter S corporation incorporated in June 1967. The corporation is an accrual basis taxpayer whose taxable year ends on June 30. The corporation buys and sells grain and charcoal, provides hauling services with its own trailers, and until late 1980 operated a grain elevator. Sylvia Handke (Mrs. Handke) is the corporate secretary. Starting in 1973, the corporation employed petitioners' daughter, Jerri Lynn O'Dell, as the corporate bookkeeper. Her duties included writing corporate checks and maintaining the corporate journals. Petitioner was an alcoholic during the years in issue. However, he went to the office most mornings and spent approximately 5 hours there. He also spent 15 to 20 hours per week meeting with customers at their places of business. Petitioner determined the account in the corporate journal to which most expenses were to be posted. Petitioner knew that *293 for tax purposes the income of the corporation was the excess of receipts over expenses. The corporate and personal returns for the years in issue were prepared by Paul Beecroft (Beecroft), a licensed public accountant. The corporation provided Beecroft with the corporate journals, a copy of the corporate checks, the corporate bank statements, and the deposit forms. Beecroft did not see the invoices, receipts, or other records associated with the expenses entered in the corporate journals. Beecroft would check the accuracy of the journal by matching the checks and deposits with journal entries and would record any charges, such as bank charges and interest payments. Beecroft prepared the returns from the information in the corporate journals. Based on the records that he saw, Beecroft thought the corporate records were prepared adequately. Beecroft prepared petitioners' personal returns from tax forms, such as Schedules 1099 and K-1, and from a questionnaire that he sent to petitioners. Beecroft did not see petitioners' checkbooks, receipts, or other personal records. In the notice of deficiency, respondent determined that the corporation had paid many of petitioners' personal *294 expenses during the corporate years ending in 1978 through 1981. As a result, he increased petitioners' dividend income due to constructive dividends from the corporation. He also adjusted the corporation's taxable income and undistributed taxable income. As adjusted, the corporation's taxable income ranged from a low of $ 88,531.30 in the taxable year ending in 1979 to a high of $ 253,880.91 in the taxable year ending in 1981. The adjustments made by respondent are too numerous to mention in full but were based in part upon the following facts. Petitioner endorsed and personally negotiated certain checks made payable to the corporation. The corporation paid a number of personal expenses that were posted to various accounts in the corporate journal and deducted on the corporate returns. The corporation posted to its grain purchases account its purchases of a snowmobile, a pool table kept at petitioner's home, a stock option, and municipal bonds and the interest incurred to purchase them. The corporation posted to its grain elevator expenses account the cost of remodeling work on petitioners' residence. The corporation posted to its utilities account the cost of electrical and *295 gas service to petitioners' residence. The corporation posted to its taxes account the taxes assessed on petitioners' home, some of which were also deducted on petitioners' individual return. The corporation posted to its insurance account the insurance on motor vehicles owned by petitioners. The corporation posted to its repair and maintenance account the cost of crystal chandeliers in petitioners' home and the cost of remodeling petitioners' home. The corporation posted to its depreciation account the depreciation on petitioners' automobiles and motor home. The corporation deducted payments on life insurance policies that petitioners had on each other. In addition, certain invoices and receipts falsely indicated that personal expenditures made by the corporation were for corporate items. At petitioner's request, a contractor who did room expansion and miscellaneous carpentry at petitioners' house completed certain invoices to show that the work was "Maintenance and repair on buildings." At petitioner's request, the same contractor falsely stated at an October 1983 deposition that some of his work was done at the business. In addition, various receipts from a hardware store *296 that sold home furnishing items were placed in evidence. One receipt was for a "Control Unit for Semi Trailer Refer," an item which the hardware store did not sell. On one corporate check for home improvements, petitioner typed "Bldg. Repairs." On another corporate check for home improvements was written the notation "paint grain elevator." On a charge card bill, petitioner indicated that a charge for a shower enclosure was for "steel-bolts & plywood to repair van trailer." On other charge card bills, petitioner had noted that charges for chandeliers were "Bldg. Repair -- Grain Elevator -- Security Light & Bulbs," and "For dust probe light fixtures for Grain Elevator." In November 1981, petitioner falsely told the revenue agent conducting the audit that an invoice for bathroom labor and materials at his home was for the bathroom at the grain elevator. In the notice of deficiency for the 1982 tax year, respondent determined that the corporation had unreported income of over $ 1 million. Respondent now agrees that petitioners' deficiency for 1982 was substantially less than determined in the notice of deficiency. During 1982, the corporation paid and deducted expenses similar to those *297 in 1978 through 1981. Petitioners were first audited in late 1981. In June 1985, petitioner was indicted on counts of tax evasion under section 7201 for his 1979 and 1980 tax years. In October 1985, petitioner pled guilty to the count of tax evasion for the 1980 year. As a part of the plea bargain, the tax evasion charge for 1979 was dismissed. OPINION The issues are petitioners' liability for Federal income taxes resulting from alleged improper treatment of items of income and expense by petitioner's wholly owned subchapter S corporation for the years 1978 through 1982, and petitioners' liability for the fraud additions under section 6653(b) for the years 1978 through 1981. I. Liability for tax
Petitioners bear the burden of proof. Rule 142(a). Accordingly, we consider as conceded the many items which they have not addressed on brief. We will briefly discuss some of petitioners' arguments regarding the remaining items. Petitioners state that the record is devoid of any evidence that the corporation failed to report the income represented by the checks that were made payable to the corporation but deposited or cashed by petitioner. This argument does not help petitioners because *298 they bear the burden of presenting evidence that they did report the income. Petitioners also argue that they may take a deduction for the snowmobile purchased in January 1978 because petitioner used the snowmobile after a heavy snow to get to his trailers and sweep off snow before the snowplow arrived. We do not find this explanation to be plausible, in part because petitioner presented no evidence that would support it. We conclude that petitioner used the snowmobile for recreation. Another of petitioners' arguments is that various expenditures, such as the pool table and chandeliers, were deductible because they were part of a home office. Petitioner may at times have done some work at home, and he testified that his home was his "corporate headquarters." However, there is no evidence that petitioner had a home office which was exclusively used on a regular basis as his principal place of business. See section 280A(c)(1)(A). In addition, even if petitioner did have a home office, we question whether items such as a pool table and chandeliers could rightfully be considered to be part of the home office. The corporation purchased certain municipal bonds during the years in issue. *299 Petitioner says the corporation held the bonds as collateral for an open line of credit for margin calls. However, petitioner did not introduce a single document which indicated that the bonds were so used. So far as we can tell from the record, the bonds were personal investments. In addition, petitioner has not explained why the corporation would be entitled to deduct the cost of a capital asset such as a bond. The corporation also took certain deductions relating to automobile expenses. Respondent has disallowed a portion of these deductions. Petitioners have offered no evidence, other than their unsubstantiated testimony, to support deductions greater than those allowed by respondent. Petitioners assert that the corporation should be able to deduct as business expenses the cost of the alcohol petitioner purchased for himself and his business colleagues. This is an interesting argument since petitioner also argues that his actions were not fraudulent because his alcoholism impaired his cognition and memory, and prevented him from keeping adequate records. Thus, petitioner seeks to take a business deduction for expenditures which, he asserts, harmed his ability to manage *300 his business. We reject this argument. Petitioners also assert that the corporation should be able to deduct interest expenses relating to its purchase of municipal bonds in 1978 through 1980. However, interest is not deductible when it is incurred to purchase tax-free bonds. Sec. 265(2). Petitioners additionally assert that the corporation should be able to deduct $ 5,679 interest expense incurred in 1981. Respondent in the notice of deficiency determined that this $ 5,679 amount was not expended for the purpose designated. Petitioners have introduced no evidence on this issue, so this deduction is disallowed. Petitioners discuss numerous other deductions. We have considered each of those deductions and have determined that none is supported in the record. Accordingly, petitioners have failed to carry their burden of proof with respect to all items for the years 1978 through 1981, and with respect to all items for 1982 after adjustments for respondent's concessions. We next discuss petitioners' contention that a subchapter S corporation cannot make constructive dividends, and thus that they could not have received dividend income from the corporate expenditures. Petitioners *301 apparently make this argument because they believe that a dollar of disallowed deductions on the corporate level will cause them to realize both one dollar of constructive dividend income and one dollar of income passed through from the corporation as undistributed taxable income. However, undistributed taxable income is reduced by one dollar for every dollar of dividends paid. Sec. 1373(c). Accordingly, the disallowance of a dollar of deductions on the corporate level will cause petitioners to realize only one additional dollar of taxable income. However, petitioners' argument that a subchapter S corporation cannot make constructive dividends has implications for the timing of their tax liability. Because the corporation has a June 30 taxable year, any undistributed taxable income allocable to the second half of a calendar year would not be passed through to petitioners until the following calendar year. However, any constructive dividend would be realized by petitioners at the time the corporation paid their personal expenses. Thus, petitioners' tax liability will be delayed if a subchapter S corporation cannot make constructive dividends. Petitioners' argument might appear to *302 be supported by several cases that held that the constructive receipt doctrine does not apply to subchapter S corporations. See McKelvy v. United States, 201 Ct. Cl. 557, 478 F.2d 1217 (1973); Attebury v. United States, 430 F.2d 1162, 1168 (5th Cir. 1970); Estate of McWhorter v. Commissioner, 69 T.C. 650, 659-660 (1978), affd. 590 F.2d 340 (8th Cir. 1978). However, the issue in these cases was whether the shareholders had constructive receipt of dividend income prior to the time when their subchapter S corporation actually made a distribution. The constructive receipt of income is described in section 1.451-2(a), Income Tax Regs: (a) General rule. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *
Unlike the cited cases, which *303 involved the possible constructive receipt of a dividend distribution that would occur in the future, the instant case involves a completed distribution. The corporation actually paid petitioners' obligations, and petitioners actually were relieved of a liability. The only issue is whether the treatment given a direct cash distribution should extend to an indirect distribution accomplished by the corporation's payment of petitioners' liabilities. This is very different from the issue addressed in the cited cases, and accordingly those cases are inapplicable to the instant case. We conclude that petitioners did receive constructive dividends because the substance of the corporate payments was essentially the same as if there had been direct cash distributions. We should note that Attebury v. Commissioner , supra at 1168, says -- In our opinion, the phrase "amount of money distributed * * * during the taxable year" [in section 1373(c)] means actual cash distributions to shareholders before the end of the corporate year.
If only a direct cash distribution is an "actual cash distribution," Attebury would imply there was no constructive dividend in the instant case because there was *304 no actual cash distribution to the shareholders that would have caused a reduction in undistributed taxable income under section 1373(c). However, actual cash distributions are not limited to direct cash distributions. Accordingly, the reference in section 1373(c) to the "amount of money distributed" applies both to a direct cash distribution to shareholders and to a distribution accomplished through the payment of the shareholders' personal obligations. The Attebury court also discusses the language of section 1.1373-1(f), Income Tax Regs., and concludes that "a distribution is deemed to occur only when it is actually paid by the corporation." Attebury v. Commissioner, supra at 1168. This conclusion is consistent with our analysis because in the instant case the corporation actually paid the distribution when it paid petitioners' personal expenses. Accordingly, the distribution occurred at that time. II. Fraud
Respondent determined that petitioners are liable for additions to tax under section 6653(b) for the years 1978 to 1981. We will uphold respondent's determination if he shows by clear and convincing evidence that petitioners intended to evade taxes known to be owing by *305 conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Rowlee v. Commissioner, 80 T.C. 1111 (1983); Rule 142(b). As a result of pleading guilty to violating section 7201 for 1981, petitioner is collaterally estopped from denying that a part of the deficiency in that year was due to fraud. Arctic Ice Cream Co. v. Commissioner, 43 T.C. 68, 74-75 (1964).In addition, petitioner's actions necessarily lead to the conclusion that he intended to evade taxes during 1978 through 1981. Petitioner is a college graduate who knew that his corporation owed taxes on the difference between its revenues and expenses. Yet he had the corporation pay numerous personal expenditures which were posted to the corporate books and deducted on the corporate returns as corporate expenses. Petitioner methodically committed his fraud. Every corporate payment of petitioners' insurance was posted to the corporate insurance account, every corporate payment of petitioners' taxes was posted to the corporate taxes account, and every corporate payment of petitioners' utilities was posted to the corporate utilities account. Petitioner asked some suppliers to falsify records, and petitioner *306 himself wrote false explanations on some documents. During the years 1978 through 1981, petitioner's efforts to shift personal expenses to the corporation were so careful, meticulous, consistent, and repetitive that we cannot possibly find that they were occasional oversights or innocent mistakes. The entire pattern of petitioner's actions shows a clear intent to evade tax and to conceal his actions. We have no doubt that he knew what he was doing and why he was doing it. Petitioner makes various defenses to the fraud charges. One is that he did not intend to evade tax because he relied upon his accountant's judgment and just signed the tax returns. However, petitioner did not tell his accountant that he was providing false information, so his accountant did not know that the returns were false. Thus, petitioner hardly could rely upon his accountant's judgment regarding the adequacy of the returns. Petitioner also says that his accountant gave him an unqualified opinion about his books, and that he relied on the opinion. However, the accountant testified that he never checked the accuracy of any of the information provided him. In addition, an accountant's failure to detect *307 fraud hardly absolves the person who created the fraud. Petitioner also asserts that he considered his home to be his office and, thus, thought that any expenditures incurred there could be paid by the corporation and deducted on the corporate return. We find it hard to believe, however, that a college graduate would believe that an expenditure on items such as a pool table and chandeliers could be deducted as corporate expenditures. Petitioner's argument also is inconsistent with his actions. If he honestly believed that the expenditures were deductible, he would not have tried to hide the expenditures on the corporate books, nor would he have falsified various documents and asked the contractor to lie at the deposition. We also note that petitioner testified that he charged only about half of the home improvements to the corporation. If petitioner had honestly believed that such expenses were deductible by the corporation, we are confident he would have charged all of them to the corporation. Petitioners also point out that they were first audited in late 1981, and they argue that under these circumstances it is inconceivable that they would have subsequently signed their 1981 *308 tax return specifically intending to evade payment of tax. However, petitioner's fraudulent bookkeeping continued during 1981, and there is no evidence that petitioner took any steps to undo his fraud before he filed his 1981 return. Finally, petitioner argues that his alcoholism seriously impaired his cognition and memory, preventing him from forming the requisite intent to evade taxes. His actions, however, are inconsistent with this theory. This is not the case of someone who was so incapacitated that he did not know that he was posting personal expenditures to corporate accounts. Instead, petitioner methodically falsified the books. We do not mean to downplay the severity of petitioner's drinking problem, but we note that petitioner testified that even some of his drinking pals did not know he was an alcoholic. This is confirmed by a revenue agent's testimony that at a November 1983 interview petitioner was very knowledgeable about corporate affairs and had a good command over procedures and records. Further confirmation of petitioner's ability to function normally is his testimony that during the years at issue he reviewed information such as newspapers and stock reports *309 that he used to make decisions regarding investments in his personal brokerage account. We also note that in the taxable year ending in 1981 the corporation had taxable income of $ 253,880.91, which was higher than in any of the three previous years. Accordingly, petitioner's drinking problem did not cause his business to deteriorate during the 1978 through 1981 period. An expert on alcoholism, Faruk Abuzzahab, M.D. (Abuzzahab), testified for petitioner. Abuzzahab had never seen petitioner before he examined petitioner for about an hour in June 1988 and concluded that he suffered from chronic alcoholism. Abuzzahab conducted his exam after petitioner had stopped drinking and was not familiar with petitioner's business activities or tax situation. In addition, Abuzzahab did not verify any information furnished by petitioner and did not even ask petitioner if he had a personal physician. Abuzzahab concluded that petitioner's alcoholism prevented him from keeping adequate records. Petitioner argues that for this reason he should not be liable for the fraud additions. However, it is clear that petitioner did a very good job of keeping records. His problem was not inadequate records *310 but false records. Abuzzahab also said petitioner would have had difficulty remembering what he did during a year when he filed a tax return on April 15 of the next year. However, the evidence indicates that the false records were created contemporaneously during the year and were due to a desire to evade tax, not to poor memory. We conclude that petitioner is liable for the fraud additions for the tax years 1978 through 1981, because in all those years he posted personal expenses to the corporate accounts with the intention that these expenses would be deducted on the corporate returns. Mrs. Handke is not liable for the fraud additions because respondent has not shown that some part of the underpayment was due to her fraud. Sec. 6653(b). Petitioners' brief does not address the additions under sections 6653(a) and 6661 for 1982. Those additions have not been conceded by respondent, so they are considered to be conceded by petitioners. Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on the deficiency.↩